**ORAL ARGUMENT NOT YET SCHEDULED**

# United States Court of Appeals
# For the District of Columbia Circuit

## Nos. 13-1059, 13-1083 & 13-1149 (Consolidated)

ILLINOIS PUBLIC TELECOMMUNICATIONS ASSOCIATION,
INDEPENDENT PAYPHONE ASSOCIATION OF NEW YORK, and
PAYPHONE ASSOCIATION OF OHIO,

*Petitioners,*

*v.*

FEDERAL COMMUNICATIONS COMMISSION and
UNITED STATES OF AMERICA,

*Respondents.*

*Petition for Review from the Federal Communications Commission*

## BRIEF FOR THE PETITIONERS

Michael W. Ward
John F. Ward, Jr.
WARD & WARD, P.C.
One Rotary Center
1560 Sherman Ave.
Suite 805
Evanston, IL 60201
(224-420-9766)
mwward@dnsys.com
jward@levelerllc.com
*Attorneys for Illinois
Public Telecom. Assoc.*

Donald J. Evans
Paul Feldman
FLETCHER, HEALD &
  HILDRETH
1300 N. 17th Street
11th Floor
Arlington, VA 22209
(703) 812-0430
evans@fhhlaw.com
feldman@fhhlaw.com
*Attorneys for Payphone
Assoc. of Ohio, Inc.*

Keith J. Roland
HERZOG LAW FIRM, P.C.
7 Southwoods Blvd.
Albany New York, 12211
(518) 465-7581
kroland@herzoglaw.com
*Attorney for Independent
Payphone Assoc. of New York,
Inc.*

*Of Counsel*
Albert H. Kramer
ALBERT H . KRAMER, PLLC
1825 I St. NW, Suite 600
Washington, D.C. 20006
(202) 207 3649

August 30, 2013

## CERTIFICATE AS TO PARTIES, RULINGS, AND RELATED CASES

**Parties and Amici.** The Petitioners in the consolidated petitions are the Illinois Public Telecommunications Association (IPTA), the Independent Payphone Association of New York (IPANY), and the Payphone Association of Ohio, Inc. (PAO). The Respondents in all three petitions are the Federal Communications Commission (Commission or FCC) and the United States of America. In the 17 years of proceedings before the Commission numerous parties have participated. Only AT&T, Inc. and Verizon have intervened in the petitions for review.

The IPTA, IPANY, and PAO are not-for-profit trade organizations organized for the purpose of promoting the general commercial, professional, legislative, and other interests of their members providing payphone services to the public in the respective states. They issue no stock, have no parent or affiliated entities, and no publicly traded company holds an equity interest of 10% or more in any of the associations. No member of any of the associations is a publicly traded company, nor does any publicly traded company own 10% or greater equity interest in any member of the associations.

Intervenors AT&T and Verizon are publicly traded companies.

**Rulings Under Review.** Petitioners each seek review of the following *In the Matter of Implementation of the Pay Telephone Reclassification and*

*Compensation Provisions of the Telecommunications Act of 1996, et al.,* FCC 13-24, CC Docket No. 96-128, Declaratory Ruling and Order, released February 27, 2013, 28 F.C.C.R. 2615 (2013) (*Refund Order*).  This decision is in the Joint Appendix.

**Related Cases.**  The Court has consolidated the Petitions For Review of the IPTA, Case No. 13-1059, IPANY, Case No. 13-1083, and PAO, Case No. 13-1149.  Counsel for Petitioners are not aware of any other related petitions for review of this order pending before this Court or of any related cases pending before any other court.

This Court has previously reviewed other matters in this proceeding in *Illinois Public Telecommunications Association v. FCC*, 117 F.3d 555 (D.C. Cir.1997), *MCI Telecommunications Corporation v. FCC,* 143 F.3d 606 (D.C. Cir.1998), *American Public Communications Council v. FCC,* 215 F.3d 51 (D.C. Cir.2000), *Global Crossing Telecommunications, Inc. v. FCC*, 259 F.3d 740 (D.D. Cir.2001), and *New England Public Communications Council, Inc. v. FCC*, 334 F.3d 69 (D.C. Cir.2003).  Related cases were decided by the Ninth Circuit, *Davel Communications, Inc. v. Qwest Corporation*, 460 F.3d 1075 (9th Cir.2006) and the Tenth Circuit, *TON Services, Inc. v. Qwest Corporation*, 493 F.3d 1225 (10th Cir.2007).

State court decisions relating to Petitioners are *Illinois Public Telecommunications Association v. Illinois Commerce Commission,* 361 Ill.App.3d 1081, 911 N.E.2d (Table) (unpublished 2005), *Independent Payphone Association of New York v. Public Service Commission of New York*, 774 N.Y.S.2d 197, 5 A.D.3d 960 (App.Div.2004), and *Payphone Association of Ohio v. Public Utilities Commission of Ohio*, 109 OhioSt.3d 453, 849 N.E.2d 4 (2006).  The state decisions are included in the Joint Appendix.

# TABLE OF CONTENTS

**PAGE**

GLOSSARY ....................................................................................xiii

STATEMENT OF JURISDICTION ........................................... 1

RELEVANT STATUTES AND REGULATIONS ...................... 1

STATEMENT OF THE ISSUES ................................................. 1

STANDING .................................................................................. 2

STATEMENT OF FACTS ........................................................... 4

I.     Telecommunications Act of 1996 ................................... 5

II.     Initial Commission Proceedings ...................................... 7

      A.     The Commission Payphone Orders ......................... 7
      B.     The Dial Around Compensation Orders ................ 10
      C.     New Services Test Orders ....................................... 14

III.     The State Proceedings ...................................................... 17

      A.     Illinois ...................................................................... 17
      B.     New York .................................................................. 20
      C.     Ohio .......................................................................... 23

IV.     The Commission Refund Order On Review ...................... 25

SUMMARY OF ARGUMENT ...................................................... 28

ARGUMENT .................................................................................. 34

I.     Standard Of Review. ........................................................ 35

II.     The Commission's Refund Order Is Inconsistent With Section 276(a) And With Section 276(c) Of The Statute ............................................ 36

TABLE OF CONTENTS

PAGE

A.   The Commission's refusal to order refunds is inconsistent with Congress' unambiguously expressed command in Section 276(a) prohibiting subsidies and discrimination after the April 15, 1997 effective date of the rules promulgated under Section 276(b)(1)(C)............................................................................36

B.   The Commission's refusal to order refunds is inconsistent with Section 276(c) and Congress' creation of a uniform nationwide pro-competitive deregulatory framework that specifically preempts any inconsistent state requirements. ........................40

III.  The Commission's Refusal To Order Refunds Is Arbitrary, Capricious, Unjustified, Contrary To The Facts Of Record And The Product Of Unreasoned Decisionmaking............................................41

A.   The Commission's conclusion that refunds of the tariffed rates are available but that individual states may nevertheless hold that refunds of the tariffed rates are not available is not the product of reasoned decisionmaking. .......................................41

1.   The filed rate doctrine and the prohibition against retroactive ratemaking do not bar refunds......................42

2.   The Commission's unjustified decision to allow inconsistent state applications of the same doctrines is arbitrary and capricious..................................................44

3.   The Commission's failure to order refunds is inconsistent with both this Court's direction and the Commission's own precedent in Section 276 cases................................47

B.   The Commission's statement that the ICC's refusal to order refunds was justified on the IPTA's failure to file a formal complaint is contrary to the facts of record.............................49

C.   The Commission's statement that the New York refusal to order refunds was justified because of IPANY's failure to exhaust administrative remedies is contrary to the facts of record and irrelevant. .................................................................................52

TABLE OF CONTENTS

PAGE

D.    The Commission's unexplained and unsupported change in its
holdings that AT&T and Verizon were not eligible for DAC in
a state until actual NST-compliant rates were in effect in that
state is arbitrary and capricious. ............................................... 55

IV.    The Commission's Decision To Allow The States To Decide If
Refunds Should Be Granted, And The Commission's Failure To
Properly Exercise Its Supervisory Responsibility In Another Instance,
Was An Unlawful Delegation To The States Of The Commission's
Responsibility Under The Statute. ....................................................... 61

A.    The Commission delegation to the states of the authority to
determine the remedy for collection by the BOCs of charges
that were not NST-compliant was unlawful. ............................ 62

B.    The Commission correctly recognized its duty to "superintend"
state activity in applying the NST methodology yet did not
correct the New York Court's bar on applying the
Commission's NST methodology. ........................................... 66

CONCLUSION ....................................................................................... 69

# TABLE OF AUTHORITIES

**Page(s)**

CASES

*Arizona Grocery Co. v. Atchison, T. & S.F. Ty. Co.,*
284 U.S. 370, 52 S. Ct. 183 (1932) .......................................................... 19, 44

*AT&T Corporation v. Iowa Utilities Board,*
525 U.S. 366, 119 S. Ct. 721 (1999) .................................................................. 6

*AT&T v. Central Office Telephone, Inc.,*
524 U.S. 214, 118 S. Ct. 1956 (1998) ............................................................. 42

*Chevron U.S.A. Inc. v. Natural Resources Defense Council, Inc.,*
467 U.S. 837, 104 S. Ct. 2778 (1984) ............................................. 35, 36, 65, 66

*Davel Communications, Inc. v. Qwest Corp.,*
460 F.3d 1075 (9th Cir.2006) ........................................................ 40, 42, 43, 44

*Global Crossing Telecommunications, Inc. v. FCC,*
259 F.3d 740 (D.C. Cir.2001) ..................................................... 14, 35, 57, 58, 59

*ICC v. Transcon Lines,*
513 U.S. 138, 115 S.Ct. 689, 130 L.Ed.2d 562 (1995) .................................... 43

* *Illinois Public Telecommunications Association v. FCC,*
117 F.3d 555 (D.C. Cir.1997) ...................................................... 36, 51, 60

*IPTA v. ICC,*
No. 1-04-0225 (1st Dist. 2005) ......................................................................... 20

*Keogh v Chicago & N. W. Ry. Co. et al.,* 260 U.S. 43 S.Ct. 47, 67 L.Ed. 183
(1922) .......................................................................................................... 44

*Lujan v. Defenders of Wildlife,*
504 U.S. 555, 112 S.Ct. 2130 (1992) .................................................................. 3

*Maislin Industries, U.S., Inc. v. Primary Steel, Inc.,*
497 U.S. 116, 110 S.Ct. 2759 (1990) ............................................................... 42

* *MCI Telecom. Corp. v. FCC,*
143 F.3d 606 (D.C. Cir. 1998) ................................................................... 47, 60

*Motor Vehicle Mfrs. Ass'n of United States, Inc. v. State Farm Mut. Auto. Ins. Co.,*
  463 U.S. 29, 103 S.Ct. 2856 (1983) ............................................................ 36, 58

*N.C. Steel v. National Council,*
  123 N.C.App. 163, 472 S.E.2d 578 (1996) ................................................ 45

*New England Public Communications Council, Inc. v. FCC,*
  334 F.3d 69 (D.C. Cir. 2003) ........................................ 16, 44, 60, 68

*Payphone Association of Ohio v. Public Utilities Commission of Ohio.*
  109 Ohio St.3d 453, 849 N.E.2d 4 (2006) ................................................ 25

*Prentice v. Title Ins. Co. of Minnesota,*
  176 Wis.2d 714, 500 N.W.2d 658 (1993) ................................................ 45

*Safehouse Progressive Alliance for Nonviolence v. Qwest,*
  174 P.3d 821 (CO 2007) ................................................................................ 45

*SBC Michigan v. Michigan PSC,*
  2006 WL 2787891 ........................................................................................ 45

*Sierra Club v. EPA,*
  292 F.3d 895 (D.C. Cir.2002) ...................................................................... 2

*Southern Cal. Edison Co. v FERC,*
  116 F.3d 507 (D.C. Cir.1997) .................................................................... 35

*Tabor v. Joint Board for Enrollment of Actuaries,*
  566 F.2d 705 (D.C. Cir.1977) .................................................................... 68

*Teleconnect Co. v. US West Communications, Inc.,*
  508 N.W.2d 644 (IA 1993) .......................................................................... 45

* *TON Services, Inc. v. Qwest Corp.,*
  493 F.3d 1225 (10th Cir.2007)............................................... 40, 42, 43, 44, 46

* *United States Telecom Ass'n v. FCC,*
  359 F.3d 554 (D.C. Cir.), *cert. denied. sub nom. Nat'l Ass'n of Regulatory Utility Comm'rs v. United States Telecom Ass'n,* 543 U.S. 925 (2004) .............................................................. 63, 64, 65, 66, 68

*Valdez v. State,*
  132 N.M. 667, 54 P.3d 71 (2002) ......................................................... 45

*Verizon Telephone Companies v. FCC,*
  269 F.3d 1098 (D.C. Cir. 2001) ........................................................ 42

## COMMISSION ACTIONS

\* *Implementation of the Pay Telephone Reclassification and Compensation
  Provisions of the Telecommunications Act of 1996, Report and Order,*
  CC Docket Nos. 96-128 & 91-35, released September 20, 1996, 11
  F.C.C.R. 20541 (1996) (*Initial Payphone Order*).......xvi, 7, 9, 19, 37, 38, 44, 56

*Implementation of the Pay Telephone Reclassification and Compensation
  Provisions of the Telecommunications Act of 1996, CC Docket 96-128,
  Third Report and Order and Order on Reconsideration of the Second
  Report and Order,* released February 4, 1999, 14 F.C.C.R. 2545 (1999)
  (*Third Payphone Order*)........................................................xix, 47-48

\* *Implementation of the Pay Telephone Reclassification and Compensation
  Provisions of the Telecommunications Act of 1996,*
  Order on Reconsideration, CC Docket Nos. 96-128, 91-35, released
  November 8, 1996, 11 F.C.C.R. 21233 (*Payphone Reconsideration
  Order*)..........................................xvii, 7, 8, 9, 37, 38, 40, 55, 56, 61, 64

\* *Implementation of the Pay Telephone Reclassification and Compensation
  Provisions of the Telecommunications Act of 1996,* CC Docket No. 96-
  128, DA 97-678, released April 4, 1997, 12 F.C.C.R. 20997 (1997) (*First
  Bureau Waiver Order*) .................................................. xv, 11, 37, 38, 56, 61, 64

\* *Implementation of the Pay Telephone Reclassification and Compensation
  Provisions of the Telecommunications Act of 1996,* CC Docket No. 96-
  128, DA 97-805, released April 15, 1997, 12 F.C.C.R. 21370 (1997)
  (*Second Bureau Waiver Order*)............ xvii, 11-12, 21, 22, 23, 37, 38, 56, 61, 64

*Implementation of the Pay Telephone Reclassification and Compensation
  Provisions of the Telecommunications Act of 1996,* CC Docket 96-128,
  Second Report and Order, released October 9, 1997, 13 F.C.C.R. 1778
  (1997) (*Second Payphone Order*) ............................................................. xviii

*Implementation of the Pay Telephone Reclassification and Compensation Provisions of the Telecommunications Act of 1996*, CC Docket 96-128, Third Report and Order and Order on Reconsideration of the Second Report and Order, released February 4, 1999, 14 F.C.C.R. 2545 (1999) (*Third Payphone Order*) .................................................................................. xix

*Implementation of the Pay Telephone Reclassification and Compensation Provisions of the Telecommunications Act of 1996*, CC Docket 96-128, FCC 02-292, 17 C.C.R. 21274 (*Fifth Payphone Order*) ................................................................................. xv, 40, 47, 48

*Implementation of the Pay Telephone Reclassification and Compensation Provisions of the Telecommunications Act of 1996*, CC Docket 96-128, FCC 13-24, Declaratory Ruling and Order, released February 27, 2013, 28 F.C.C.R. 2615 (2013) (*Refund Order*). .......................xiii, 1, 2, 3, 4, 5, 25, 27, ...............29, 30, 34, 36, 38, 40, 42, 45, 46, 48, 49, 51, 58, 59, 62, 65, 67, 68, 69

* *In the Matter of Ameritech Illinois, U.S. West Communications, Inc., et al. v. MCI Telecommunications Corporation*, Memorandum Opinion and Order, DA 99-2449, released November 8, 1999, 1999 WL 1005080 (*Ameritech Illinois*) ....................xiii, 12, 13, 17, 57, 59

*In the Matter of Bell Atlantic-Delaware, et al., v. Frontier Communications Services, Inc. et al.,* Order on Review, FCC 00-138, released April 20, 2000, 15 F.C.C.R. 7475 (2000) (*Bell Atlantic-Delaware*) .................... xiv, 13, 57

*In the Matter of Bell Atlantic-Delaware, et al. v. Frontier Communications Services, Inc, et al.*, Memorandum Opinion and Order, DA 99-1971, released September 24, 1999, 1999 WL 754402 (*Bell Atlantic-Delaware Commission Order*) .................................................................xiii, 13, 57, 59

*In the Matters of Amendment of Sections 64.702 of the Commission's Rules and Regulations (Third Computer Inquiry); and Policy and Rules Concerning Rates for Competitive Common Carrier Service and Facilities Authorizations Thereof Communications Protocols under Sections 64.702 of the Commission's Rules and Regulations*, CC Docket No. 85-229, Memorandum and Order on Reconsideration, 2 F.C.C.R. 3035 (1987) (*Computer III*).................................................................xiv, 7, 29

*In the Matter of Local Exchange Carriers' Rates, Terms and Conditions for Expanded Interconnection Through Physical Collocation for Special Access and Switched Transport,* CC Docket No. 93-162, Second Report and Order, released June 13, 1997, 12 F.C.C.R. 18730 ................................................................................... 59

*In the Matter of North Carolina Payphone Association Petition for Declaratory Ruling,* CCB/CPD No. 99-27, *Oklahoma Local Exchange Carrier Petition for Declaratory Ruling,* CCB/CPD No. 99-31 ................. 16, 46

*In the Matter of Open Network Architecture Tariffs of Bell Operating Companies,* CC Docket No. 92-91, Order, 9 F.C.C.R. 440 ........................ xiii, 59

* *In the Matter of Wisconsin Public Service Commission,* Order, DA 00-347, released March 2, 2000, 15 F.C.C.R. 9978 (2000) (*Wisconsin Bureau Order*) ....................................................... xix, 14, 21, 22, 69

* *In the Matter of Wisconsin Public Service Commission Order Directing Filings,* Bureau/CPD No. 00-01, FCC 02-25, Memorandum Opinion and Order, released January 31, 2002, 17 F.C.C.R. 2051 (2002) (*Wisconsin Payphone Order*) ..................................... xix, 7, 15, 16, 18, 21, 22, 34, 37, 38, 69

*Michigan Payphone Association Petition for Declaratory Ruling,* CCB/CPD No. 99-35, released March 5, 2002, 17 F.C.C.R. 4275 ................................ 16, 46

*Illinois Public Telecommunications Association,* ICC Docket No. 97-0255, December 17, 1997, 1997 WL 33772122 (*ICC Docket No. 97-0255 Order*) ................................................................................. xv, 18, 51

*Illinois Commerce Commission On Its Own Motion,* Interim Order, ICC Docket No. 98-0195, November 12, 2003 (*ICC Order*) ............. xvi, 2-3, 17, 18, ............................................................... 19, 20, 25, 32, 38, 49, 51, 57

*PUCO Investigation into the Implementation of Section 276 of the Telecommunications Act of 1996 Regarding Pay Telephone Services,* Opinion and Order, Case No. 96-1310-TP-COI, September 1, 2004 (*PUCO Order*) ................................................................. xviii, 25, 57

## STATUTES

5 U.S.C. §706(2)(a) ............................................................................... 35

28 U.S.C. §2342(1)............................................................................ 1

47 U.S.C. § 151 ............................................................................... 61

47 U.S.C. §153 et seq. ...................................................................... xiii

47 U.S.C. § 251 ............................................................................ 2, 64

47 U.S.C. § 252 ............................................................................... 64

47 U.S.C. §276 ................... xviii, 1, 2, 3, 4, 5, 6, 8, 9, 10, 12, 14, 15, 16, 17, 20, 23,
........................................................ 24, 28, 29, 30, 31, 33, 38, 39, 46, 47, 48, 55,
........................................................ 57, 59, 60, 61, 62, 64, 65, 66, 67, 68

47 U.S.C. §276(a).............. 1, 6, 7, 16, 18, 29, 30, 36, 37, 38, 39, 40, 41, 44, 49, 56

47 U.S.C. §276(a)(2) & (b)(1)(C) ................................................... 44

47 U.S.C. §276(b)(1) .......................................................... 6, 15, 47

47 U.S.C. §276(b)(1)(A) ........................................... xvi, 5, 8, 32, 55

47 U.S.C. §276(b)(1)(C).......................................... xv, 6, 36, 37, 39, 44

47 U.S.C. §276(c)....................... 1, 7, 8, 15, 30, 36, 40, 43, 61, 64, 66

47 U.S.C. §402(a).............................................................................. 1

220 ILCS 5/10-108 ......................................................................... 49

**OTHER AUTHORITIES**

47 C.F.R. § 61.49.............................................................................. 5

47 C.F.R. § 64.1330...........................................................................8

# GLOSSARY

**1996 Act** – Telecommunications Act of 1996, Pub. L. 104-104, 110 Stat. 56, codified at 47 U.S.C. §153 et seq.

***Ameritech Illinois*** – *In the Matter of Ameritech Illinois, U.S. West Communications, Inc., et al. v. MCI Telecommunications Corporation*, Memorandum Opinion and Order, DA 99-2449, released November 8, 1999, 1999 WL 1005080.

**AT&T** – AT&T, Inc. and/or its affiliates providing local telephone services in various states, including Illinois and Ohio. Over the 17 years of these proceedings other names include Illinois Bell Telephone Company, Ameritech Illinois, SBC Illinois, AT&T Illinois, Ohio Bell Telephone Company, Ameritech Ohio, SBC Ohio, and AT&T Ohio. They will collectively be referred to as AT&T, unless a state specific designation is indicated.

**Basic Telephone Service** – local exchange telephone services, including access lines, usage, and features, provided by local exchange companies such as AT&T and Verizon to payphone service providers.

***Bell Atlantic-Delaware*** – *In the Matter of Bell Atlantic-Delaware, et al. v. Frontier Communications Services, Inc, et al.*, Memorandum Opinion and Order, DA 99-1971, released September 24, 1999, 1999 WL 754402.

**_Bell Atlantic-Delaware Commission Order_** – _In the Matter of Bell Atlantic-Delaware, et al., v. Frontier Communications Services, Inc. et al.,_ Order on Review, FCC 00-138, released April 20, 2000, 15 F.C.C.R. 7475 (2000).

**Bell Operating Companies** – the local exchange affiliates of AT&T, Verizon, and other Bell Regional Holding Companies which provide local telephone services in the various states.

**BOC** – Bell Operating Company.

**Commission** – Federal Communications Commission.

**_Computer III_** – _In the Matters of Amendment of Sections 64.702 of the Commission's Rules and Regulations (Third Computer Inquiry); and Policy and Rules Concerning Rates for Competitive Common Carrier Service and Facilities Authorizations Thereof Communications Protocols under Sections 64.702 of the Commission's Rules and Regulations_, CC Docket No. 85-229, Memorandum and Order on Reconsideration, 2 F.C.C.R. 3035 (1987).

**Computer III Safeguards** – pricing standard established by the Commission governing certain BOC services, based on forward looking costs with reasonable overhead allocation, in the Computer Inquiry III proceedings (Docket 90-623). This standard was set by Congress in §276(b)(1)(C) as the minimum standards to be imposed by the Commission in establishing nonstructural safeguards for BOC payphone service.

**DAC** – dial around compensation.

**Dial around calls** – coinless calls that are placed through the payphone in which the consumer would dial an access number to route the call through an interexchange carrier of her choosing, which carrier would then bill and collect the charges for the call.

**Dial around compensation** – compensation paid to a payphone service provider pursuant to Section 276(b)(1)(A) for a completed dial around call that originated from its payphone.

**FCC** – Federal Communications Commission.

***Fifth Payphone Order*** – *Implementation of the Pay Telephone Reclassification and Compensation Provisions of the Telecommunications Act of 1996*, CC Docket 96-128, FCC 02-292, released October 23, 2002, 17 F.C.C.R. 21274 (2002).

***First Bureau Waiver Order*** – *Implementation of the Pay Telephone Reclassification and Compensation Provisions of the Telecommunications Act of 1996*, CC Docket No. 96-128, DA 97-678, released April 4, 1997, 12 F.C.C.R. 20997 (1997).

**ICC** – Illinois Commerce Commission.

***ICC Docket No. 97-0255 Order*** – *Illinois Public Telecommunications Association*, ICC Docket No. 97-0255, December 17, 1997, 1997 WL 33772122.

**ICC Order** – *Illinois Commerce Commission On Its Own Motion,* Interim Order, ICC Docket No. 98-0195, November 12, 2003.

**Illinois Public Telecommunications Association** – the trade association of payphone providers in Illinois which is one of the Petitioners herein.

**Independent Payphone Association of New York** – the trade association of payphone providers in New York which is one of the Petitioners herein.

**Independent payphone provider** – a payphone service provider that is not affiliated with the BOCs or any other local exchange company.  It is also sometimes referred to as a COCOT (Customer Owned Coin Operated Telephone).

**Initial Payphone Order** – *Implementation of the Pay Telephone Reclassification and Compensation Provisions of the Telecommunications Act of 1996*, CC Docket 96-128, Report and Order, released September 20, 1996,11 F.C.C.R. 20541 (1996).

**Interexchange carrier** – a carrier of telephone calls being transmitted between telephone exchanges.

**IPANY**  – Independent Payphone Association of New York.

**IPP** – independent payphone provider.

**IPTA** – Illinois Public Telecommunications Association.

**IXC** – interexchange carrier.

**New Services Test** – a cost methodology used as a basis for the pricing of services developed as a competitive safeguard in the Commission's Computer III proceedings.

**NST** – New Services Test.

**NYPSC** – New York Public Service Commission.

***ONA Proceedings*** – *Open Network Architecture Tariffs of Bell Operating Companies,* 9 FCC Rcd. 440 (1993).

***Order on Reconsideration*** – *Payphone Reconsideration Order*.

**PAO** – Payphone Association of Ohio**.**

**Payphone Association of Ohio** - the trade association of payphone providers in Ohio which is one of the Petitioners herein.

***Payphone Reconsideration Order*** – *Implementation of the Pay Telephone Reclassification and Compensation Provisions of the Telecommunications Act of 1996,* CC Docket 96-128, Order on Reconsideration, released November 8, 1996, 11 F.C.C.R. 21233 (1996).

**Payphone Service Provider** – a company that provides pay telephone service to the public.

**PSP** – payphone service provider.

**PUCO –** Public Utilities Commission of Ohio.

**PUCO Order** – *PUCO Investigation into the Implementation of Section 276 of the Telecommunications Act of 1996 Regarding Pay Telephone Services*, Opinion and Order, Case No. 96-1310-TP-COI, September 1, 2004.

**RBOC Coalition Letters** – letters to the Commission from counsel for the RBOC Payphone Coalition on behalf of AT&T, Verizon, and other BOCs dated April 10 and 11, 1997.

**Refund Order** – *Implementation of the Pay Telephone Reclassification and Compensation Provisions of the Telecommunications Act of 1996*, CC Docket 96-128, FCC 13-24, Declaratory Ruling and Order, released February 27, 2013, 28 F.C.C.R. 2615 (2013), the Order under review herein.

**Report and Order** – *Initial Payphone Order*.

**Second Bureau Waiver Order** – *Implementation of the Pay Telephone Reclassification and Compensation Provisions of the Telecommunications Act of 1996*, CC Docket No. 96-128, DA 97-805, released April 15, 1997, 12 F.C.C.R. 21370 (1997).

**Second Payphone Order** – *Implementation of the Pay Telephone Reclassification and Compensation Provisions of the Telecommunications Act of 1996*, CC Docket 96-128, Second Report and Order, released October 9, 1997, 13 F.C.C.R. 1778 (1997).

**Section 276** – 47 U.S.C. §276.

***Third Payphone Order*** – *Implementation of the Pay Telephone Reclassification and Compensation Provisions of the Telecommunications Act of 1996*, CC Docket 96-128, Third Report and Order and Order on Reconsideration of the Second Report and Order, released February 4, 1999, 14 F.C.C.R. 2545 (1999).

**Verizon** – Verizon New York, which provides local telephone service in the state of New York. Over the 17 years of these proceedings, Verizon New York has been known as New York Telephone, NYNEX and Bell Atlantic. It will be referred to as Verizon.

***Wisconsin Bureau Order*** – *In the Matter of Wisconsin Public Service Commission*, Order, DA 00-347, released March 2, 2000, 15 F.C.C.R. 9978 (2000).

***Wisconsin Payphone Order*** – *In the Matter of Wisconsin Public Service Commission Order Directing Filings*, Bureau/CPD No. 00-01, FCC 02-25, Memorandum Opinion and Order, released January 31, 2002, 17 F.C.C.R..2051 (2002).

***Wisconsin Orders*** – the *Wisconsin Bureau Order* and the *Wisconsin Payphone Order*.

## STATEMENT OF JURISDICTION

The Commission proceedings below were held pursuant to Section 276 of

the Telecommunications Act of 1996 (1996 Act) directing the Commission to

enforce the nondiscrimination safeguards prohibiting the Bell Operating

Companies (BOCs), including AT&T and Verizon, from subsidizing or

discriminating in favor of their payphone operations.  47 U.S.C. §276.  On

February 27, 2013, the Commission released the *Refund Order* denying

Petitioners' requests for refunds from AT&T and Verizon for overcharges to

Petitioners' members in violation of the Section 276 requirements.  This is a final

order.  The Illinois, New York, and Ohio associations filed their petitions for

review on March 8, 2013, March 27, 2013, and April 26, 2013.  This Court has

jurisdiction over the petitions pursuant to 47 U.S.C. §402(a) and 28 U.S.C.

§2342(1).

## RELEVANT STATUTES AND REGULATIONS

The pertinent statutes are 47 U.S.C. §§ 251 and 276 and are set forth in the

Addendum to this Brief.

## STATEMENT OF THE ISSUES

(1)     Whether the Commission's *Refund Order* is inconsistent with Section

276(a) and with Section 276(c) of the statute.

(2)     Whether the Commission's refusal to order refunds is arbitrary, capricious, unjustified, contrary to the facts of record and the product of unreasoned decisionmaking.

(3)     Whether the Commission's decision to allow the states to decide if refunds should be granted, and the Commission's failure to properly exercise its supervisory responsibility in another instance, was an unlawful delegation to the states of the Commission's responsibility under the statute.

## STANDING

Petitioners IPTA, IPANY, and PAO each have standing to bring its petition. Each petitioner is a state trade association representing numerous payphone service providers (PSPs) that, after the effective date of the Commission's Section 276 rules, purchased local telephone services from either AT&T or Verizon at rates that exceeded the required cost-based rates that complied with the Commission's New Services Test (NST).  In the *Refund Order*, the Commission failed to order refunds to the Petitioners' members.

An association has standing to act on behalf of its members if (1) at least one of the members has standing to sue in his own right, (2) the interests the association seeks to protect are germane to its purpose, and (3) neither the claim asserted nor the relief requested requires the individual member to participate in the lawsuit.  *Sierra Club v. EPA*, 292 F.3d 895, 898 (D.C. Cir. 2002).  A member

has standing to sue if (1) he suffered a concrete and particularized injury in fact, (2) there is a causal connection between the injury and the conduct complained of, and (3) it is likely that the injury will be redressed by a favorable decision. *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560 (1992).

Petitioners' members have standing through their concrete injury suffered by paying years of excessive charges caused by AT&T and Verizon's failure to have NST-compliant rates. This injury will be redressed by refunding the overcharges. The failure to have NST-rates was an injury solely affecting the rights of the PSPs. The PSPs have standing to enforce the procedure established by the Commission specifically to ensure the PSPs receive NST-complaint rates effective no later than April 15, 1997 through requiring actual NST-compliant rates before the BOCs are eligible to receive dial around compensation (DAC). Enforcement of the established procedure will make it likely that the PSPs injury will be redressed. *See* Argument III.D.

The Petitioner associations are organized and function for the purpose of representing their members in legislative, regulatory, and legal matters affecting them, such as this one. Resolution of an order requiring refunding of the overcharges will not require the participation of any individual member.

The *Refund Order* directly injured Petitioners' members by failing (1) to preempt the state public utility commission decisions in the Petitioners' states

which held that refunds of overcharges that exceeded the federal requirements were not available in that state, (2) to enforce the requirements of Section 276 and the Commission's orders implementing the NST-rate requirement, and (3) to require refund of overcharges to Petitioners' members. A reversal and vacation of this part of the *Refund Order* with directions to require refunds, with interest, to Petitioners' members of any overcharges that exceed NST-compliant rates after April 15, 1997 will redress this harm.

## STATEMENT OF FACTS

Petitioners filed petitions for declaratory rulings before the Commission for an order for refunds to recover millions of dollars in AT&T and Verizon overcharges paid by the Petitioners' members that exceeded the cost-based rates required by federal statute and the rules and regulations of the Commission. In numerous orders, the Commission repeatedly held that Section 276 of the 1996 Act required the BOCs to provide local telephone lines, usage and other features (Basic Telephone Services) to PSPs at cost-based rates that complied with the Commission's New Services Test by no later than April 15, 1997. Although for years after the effective date of the Commission's rules AT&T and Verizon charged Petitioners' members rates far in excess of the federally required rates, Petitioners' states refused to order refunds of the overcharges. Even though most other states did approve refunds, and in the *Refund Order* the Commission has now

held that refunds of charges in excess of the Section 276 requirements are available going back to April 15, 1997, the Commission failed to require refunds of the overcharges in the Petitioners' states.

To ensure enforcement of the NST-rate requirement, the Commission required the BOCs to have actual NST-compliant rates in effect as a prerequisite for the BOCs receiving the compensation authorized under Section 276(b)(1)(A), known as dial around compensation (DAC). Although the state proceedings established that, as a result of the BOCs' false certification of compliance, the BOCs received hundreds of millions of dollars in DAC for years before they had actual NST-compliant rates in effect, neither the states, nor the Commission in the *Refund Order,* enforced these requirements.

The petitions for review address the positions taken by the states of Illinois, New York, and Ohio that are inconsistent with the requirements of the uniform nationwide federal program and the Commission's failure to enforce these requirements.

## I.     Telecommunications Act of 1996

In the passage of the 1996 Act, Congress fundamentally restructured the local telecommunications industry, subjecting the BOCs to a host of duties intended to facilitate competition, and has taken regulation of local telecommunications competition away from the states with regard to matters

addressed in the 1996 Act. *AT&T Corporation v. Iowa Utilities Board*, 525 U.S. 366, 371, 378 fn 6, 119 S. Ct. 721 (1999). In Section 276 of the 1996 Act, Congress specifically addressed the changes to be made in the provision of payphone services.

Due to the conflicting roles that the BOCs served both by supplying the underlying Basic Telephone Services needed by PSPs and by competing against those same PSPs through the BOC payphone services, Congress imposed nondiscrimination safeguards in subsection 276(a). These safeguards prohibited a BOC from (1) directly or indirectly subsidizing its payphone services from its telephone exchange service operations or its exchange access operations, and (2) preferring or discriminating in favor of its own payphone service. 47 U.S.C. §276(a). To promote the twin goals of competition among PSPs and the widespread deployment of payphone services to benefit the general public, Congress required the Commission to prescribe a set of nonstructural safeguards at a minimum equal to those adopted in the Commission's Computer Inquiry-III proceedings (*Computer III*) to implement the provisions of subsection 276(a). 47 U.S.C. §276(b)(1)(C). Congress directed that the Commission adopt the necessary regulations by November 8, 1996. 47 U.S.C. §276(b)(1). Subsidization and discrimination after the effective date of the rules were prohibited by statute. 47

U.S.C. §276(a).  Any state requirements inconsistent with these regulations were expressly preempted.  47 U.S.C. §276(c).

## II.    Initial Commission Proceedings

### A.    The Commission Payphone Orders

The Commission issued rules implementing the requirements of the statute. *Implementation of the Pay Telephone Reclassification and Compensation Provisions of the Telecommunications Act of 1996, Report and Order*, CC Docket Nos. 96-128 & 91-35, released September 20, 1996, 11 F.C.C.R. 20541, ¶2 (1996) (*Report and Order* or *Initial Payphone Order*).  JA___.

The Commission found that because BOCs[1] may have the incentive to charge competitors unreasonably high prices for Basic Telephone Services it was necessary for their rates for these services to satisfy the NST for cost-based pricing as developed in the Commission's *Computer III* and *ONA Proceedings*.  The Commission concluded that these requirements would ensure that BOCs did not discriminate or cross-subsidize in their provision of payphone services.  *Id.*, ¶¶146-147, 199.  Compliant tariffs were required to be filed at the Commission by January 15, 1997.  The Commission held any state requirement for a different

---

[1]  Until 2002, the Commission applied Section 276(a) to all local exchange companies.  Later the Commission held that Section 276(a) only applied to the BOCs.  *In the Matter of Wisconsin Public Service Commission*, 17 F.C.C.R. 2051, released January 31, 2002 ("*Wisconsin Payphone Order*").  To avoid confusion in the brief the Petitioners will only reference the application of Section 276(a) as to the BOCs.

pricing of Basic Telephone Services was expressly preempted pursuant to Section 276(c). *Id.*, ¶¶146–147.

Separately, Section 276(b)(1)(A) required the Commission to ensure that PSPs are compensated for all completed calls made from their payphones. 47 U.S.C. §276(b)(1)(A). This included coinless calls placed through the payphone in which the consumer would dial an access number to route the call through an interexchange carrier (IXC) of her choosing, which carrier would then bill and collect the charges for the call. The Commission established a system for the IXCs to compensate the PSP for the completed calls that originated from its payphone. Correspondingly, this was known as dial around compensation. The Commission determined that, before BOCs would be eligible to receive DAC, Section 276 required them to first discontinue their subsidies. They had one year from the effective date of the rules to discontinue their subsidies and would not be eligible for compensation until that date. *Id.*, ¶50.

On reconsideration, the Commission again found that to achieve the statutory goals it was necessary to remove subsidies to payphones, provide for nondiscriminatory access to bottleneck facilities, ensure compensation for all calls from payphones, and allow competitors an equal opportunity to compete. *Implementation of the Pay Telephone Reclassification and Compensation Provisions of the Telecommunications Act of 1996,* Order on Reconsideration, CC

Docket Nos. 96-128, 91-35, released November 8, 1996, 11 F.C.C.R. 21233, ¶139

(*Order on Reconsideration* or *Payphone Reconsideration Order*).  JA___.

The Commission also decided that tariffs for Basic Telephone Services

provided by BOCs to PSPs would be filed with the states, instead of with the

Commission.  In doing so, the Commission reiterated the requirements for the

tariff that the states must enforce:

> The [state] tariffs for these [BOC] payphone services
> must be: (1) cost based; (2) consistent with the
> requirements for Section 276 with regard, for example, to
> the removal of subsidies from exchange and exchange
> access services; and (3) nondiscriminatory.  States must
> apply these requirements and the *Computer III* guidelines
> for tariffing such intrastate services. . . .  We will rely on
> the states to ensure that the basic payphone line is tariffed
> by the [BOCs] in accordance with the requirements of
> Section 276.  As required in the *Report and Order*, and
> affirmed herein, all required tariffs, both intrastate and
> interstate, must be filed by January 15, 1997 and must be
> effective no later than April 15, 1997.

*Id.*, ¶163.

In the reconsideration proceedings, the BOCs requested to be allowed to

begin receiving DAC under Section 276 earlier than the October, 1997 date set in

the *Initial Payphone Order*.  The Commission agreed that BOCs could begin

receiving DAC by the April 15, 1997 deadline set for the intrastate tariff

requirements provided they first completed all the steps necessary to be eligible for

compensation. *Id.*, ¶130.  The Commission was emphatic about ensuring

compliance with the Section 276 requirements as a prerequisite for the receipt of

DAC:

> We must be cautious, however, to ensure that [BOCs]
> comply with the requirements we set forth in the *Report
> and Order*.  Accordingly, we conclude that [BOCs] will
> be eligible for compensation like other PSPs when they
> have completed the requirements for implementing our
> payphone regulatory scheme to implement Section 276.
> [BOCs] may file and obtain approval of these
> requirements earlier than the dates included in the *Report
> and Order,* as revised herein, but no later than those
> dates.  To receive compensation a [BOC] must be able to
> certify the following: . . . (5) it has in effect intrastate
> tariffs for basic payphone services (for "dumb" and
> "smart" payphones); . . .

*Id.*, ¶ 131.

## B.    The Dial Around Compensation Orders

In an *ex parte* filing, the BOCs raised concerns about the requirements

needed to be met as a prerequisite for their DAC eligibility.  On April 4, 1997 the

Common Carrier Bureau (Bureau) issued an order pursuant to its delegated

authority to address the prerequisites:

> We emphasize that [BOCs] must have effective state
> tariffs that comply with the requirements set forth in the
> *Order on Reconsideration*.  These requirements are:  (1)
> that payphone services state tariffs must be cost-based,
> consistent with Section 276, nondiscriminatory; and
> consistent with *Computer III* tariffing guidelines; and (2)
> that payphone costs for unregulated equipment and
> subsidies be removed from the intrastate local exchange
> service and exchange access service rates.  [BOC]
> intrastate tariffs must comply with these requirements by

April 15, 1997 for the payphone operations of [BOCs] to receive payphone compensation. As discussed above, for [BOCs] that have not complied with these requirements, their payphone operations will not be entitled to compensation pursuant to the *Payphone Reclassification Proceeding*, in the states in which they do not comply.

*Implementation of the Pay Telephone Reclassification and Compensation Provisions of the Telecommunications Act of 1996,* CC Docket No. 96-128, DA 97-678, released April 4, 1997, 12 F.C.C.R. 20997, ¶35 (*First Bureau Waiver Order*) (footnotes omitted). JA___.

The BOCs were concerned that they would not have intrastate NST-compliant tariffs on file by April 15, 1997 and therefore would not be eligible to receive DAC. They noted that where the existing state tariff rates were not NST-compliant the BOC would be required to file new tariff rates. They requested a limited 45 day waiver of the NST-rate prerequisite to allow the BOCs to file NST-compliant rates after the deadline but to permit them to receive DAC beginning April 15, 1997. The BOCs stated they would take whatever action was necessary to comply with the Commission's order to be eligible to receive DAC at the earliest possible date. This included reimbursing or providing credit to PSPs from April 15, 1997 if the NST-compliant tariffed rates, when effective, were lower than the existing rates. This was to mitigate the delay in compliance. *Implementation of the Pay Telephone Reclassification and Compensation Provisions of the Telecommunications Act of 1996,* CC Docket No. 96-128, DA 97-805, released

April 15, 1997, 12 F.C.C.R. 21370, ¶¶13 - 14, 18, 20 (*Second Bureau Waiver*

*Order*).  JA___.  The BOCs waived any claim the filed rate doctrine would

preclude their obligation to give refunds.  RBOC Coalition Letters.  JA___.

     The Bureau again emphasized that the BOCs must comply with all the

enumerated requirements in the *Payphone Orders* no later than April 15, 1997 to

be eligible for DAC.  *Id.,* ¶10.  However, the Bureau granted the BOCs a limited

waiver of the NST prerequisite for DAC eligibility.  The waiver granted BOCs

until May 19, 1997 to file NST-compliant rates to be eligible for DAC beginning

April 15, 1997.  Any BOC relying on this waiver of the NST prerequisite must

reimburse PSPs or provide them credit back to April 15, 1997 should later filed

NST-compliant rates be lower than the existing rates charged.  *Id.,* ¶25.  The

Commission retained jurisdiction under Section 276 to ensure that all state tariffing

requirements would be met.  *Id.,* ¶19 fn. 60.  On April 17, 1997 AT&T self

certified it had met the NST-compliant rate requirement and all other requirements

for DAC eligibility in Illinois and Ohio and requested the IXCs to send them

payments as of April 15, 1997.  *In the Matter of Ameritech Illinois, U. S. West*

*Communications, Inc., et al. v. MCI Telecommunications Corporation,*

Memorandum Opinion and Order, DA 99-2449, released November 8, 1999, 1999

WL 1005080, ¶8 fn. 19, ¶9 fn. 23 (*Ameritech Illinois*).  JA___.  On June 27, 1997

Verizon also self certified it had complied with the NST-rate requirement and all

other requirements as a prerequisite for DAC eligibility in New York and

requested payments. *In the Matter of Bell Atlantic-Delaware, et al., v. Frontier*

*Communications Services, Inc. et al.,* Memorandum Opinion and Order, DA 99-

1971, released September 24, 1999, 1999 WL 754402, ¶1 fn. 1, ¶9 fn. 23 (*Bell*

*Atlantic-Delaware).* JA___.

     PSPs and IXCs challenged the self certifications by AT&T and Verizon.

The IXCs refused to make DAC payments without proof the prerequisites had

actually been met. The Bureau held that the Commission did not include a proof

requirement for payments to commence. *Ameritech Illinois,* ¶18; *Bell Atlantic-*

*Delaware,* ¶19. But the Bureau made clear that while the certification procedurally

required the commencement of payments, it did not excuse BOCs from the

requirement to be in actual compliance for eligibility:

> We emphasize that a [BOC's] certification letter does not
> substitute for the [BOC's] obligation to comply with the
> requirements as set forth in the *Payphone Orders*. The
> Commission consistently has stated that [BOCs] must
> satisfy the requirements set forth in the *Payphone*
> *Orders*, subject to waivers subsequently granted, to be
> eligible to receive compensation. Determination of the
> sufficiency of the [BOC's] compliance, however, is a
> function solely within the Commission's and state's
> jurisdiction.

Ameritech Illinois, ¶27; see also Bell Atlantic-Delaware, ¶28.

     The Commission adopted the Bureau's findings and holdings. *In the Matter*

*of Bell Atlantic-Delaware, et al., v. Frontier Communications Services, Inc. et al.,*

Order on Review, 15 F.C.C.R. 7475, released April 20, 2000, ¶6 (*Bell Atlantic-Delaware Commission Order*). JA___. This Court affirmed the Commission's procedure for initiating DAC payments while noting that the certification does not substitute for the BOC's obligation to actually comply with the Section 276 requirements before it is eligible to receive compensation. *Global Crossing Telecommunications, Inc. v. FCC*, 259 F.3d 740, 744 (D.C. Cir. 2001).

### C.    New Services Test Orders

Pursuant to the Commission's retained jurisdiction, the Bureau undertook to review the BOC's rates in Wisconsin and issued a ruling on what was needed to establish compliance with the NST and other requirements. *In the Matter of Wisconsin Public Service Commission*, Order, DA 00-347, released March 2, 2000, 15 F.C.C.R. 9978 (*Wisconsin Bureau Order*). JA___. The BOCs challenged the Commission's authority to set the cost-based rates standard for states to apply to intrastate rates.

On review, the Commission affirmed its jurisdiction over the state tariffed rates. It found that to advance the statutory goals, Congress directed the Commission to "'terminat[e] the current system of payphone regulation' and 'eliminate all discrimination between [Bell Operating Company (BOC)] and independent payphones and all subsidies or cost recovery for BOC payphones.'" To comply with this statutory mandate, the Commission concluded that Section

276 requires BOCs to set their intrastate payphone line rates in compliance with the Commission's NST. *Wisconsin Payphone Order*, ¶2.

Responding to the jurisdictional challenge, the Commission held Section 276 established a comprehensive federal scheme of payphone regulation, both intra- and interstate, to be administered by the Commission. The Commission found Congress intended that the Commission occupy the field.

> This is not surprising. An overarching federal program is necessary to achieve Congress' goal of eliminating subsidies in order to "promote competition among payphone service providers and promote the widespread deployment of payphone services."[2] The importance of federal control is driven home by section 276(c), which expressly preempts "any State requirements . . . inconsistent with the Commission's regulations" implementing the statute. Such a comprehensive plan also shows that Congress intended the BOC non-discrimination and non-subsidization provisions to apply to *all* BOC payphone activity, both intra- and interstate. (Emphasis in original).

*Id.,* ¶35.

The Commission found Section 276(c) comes strongly into play here. The nonstructural safeguards implemented pursuant to Section 276(b)(1) fall within the scope of the statutory preemption provision, making the federal policy that payphone line rates be cost based binding on the states. *Id.*, ¶38.

---

[2]  47 U.S.C. § 276(b)(1).

This Court affirmed the Commission's decision as establishing NST-rate requirements affecting payphone line rates in every state. The Court held Section 276 unambiguously and straightforwardly authorizes the Commission to regulate BOCs' intrastate payphone line rates and that Section 276(b) directs the Commission to implement the anti-subsidy and anti-discrimination mandates of Section 276(a) by undertaking five specific measures, including the *Computer III* safeguards that contain the NST requirements. *New England Public Communications Council, Inc. v. FCC,* 334 F.3d 69, 75–77 (D.C. Cir. 2003).

Pursuant to the Commission's retained jurisdiction, the Bureau granted petitions for declaratory rulings filed by the North Carolina and Michigan payphone associations complaining that the decisions of their state commissions did not comply with the Section 276 and Commission requirements. The Bureau agreed the state commissions' orders appeared inconsistent with the Commission's *Wisconsin Payphone Order.* The North Carolina and Michigan commissions were directed to re-evaluate their decisions for compliance with the Commission's order. *In the Matter of North Carolina Payphone Association Petition for Declaratory Ruling,* CCB/CPD No. 99-27, *Oklahoma Local Exchange Carrier Petition for Declaratory Ruling,* CCB/CPD No. 99-31, and *Michigan Payphone Association Petition for Declaratory Ruling,* CCB/CPD No. 99-35, released March 5, 2002, 17 F.C.C.R. 4275. JA___.

### III. The State Proceedings

#### A. Illinois

Ameritech Illinois n/k/a AT&T never changed any of its state tariffed rates for Basic Telephone Services to PSPs from the passage of the 1996 Act until the Illinois Commerce Commission (ICC) found in November, 2003 that AT&T's rates were not NST-compliant. *Illinois Commerce Commission On Its Own Motion,* Interim Order, ICC Docket No. 98-0195, pp. 34–37, 46 Finding 20, November 12, 2003 (*ICC Order*). JA___. Nevertheless, on April 17, 1997 AT&T began sending letters to IXCs self certifying AT&T had met all of the Section 276 requirements for DAC eligibility. *Ameritech Illinois,* ¶9 fn. 23.

On May 8, 1997, the IPTA filed a verified petition with the ICC on behalf of the association's approximately 70 PSP members that purchased Basic Telephone Services from AT&T. The petition requested the ICC, among other things, to review the AT&T local payphone rates (1) to determine whether AT&T rates for network services provided to PSPs were cost based in compliance with the Commission's NST and, if not, (2) to determine the amount of refunds due to the association's members who purchased the network services from AT&T that were not cost based. IPTA Petition for a Declaratory Ruling, p. 5 (IPTA FCC Petition) JA___; *see also Illinois Public Telecommunications Association,* ICC Docket No.

97-0255, 1997 WL 33772122 (December 17, 1997), pp. 1-2 (*ICC Docket No. 97-0255 Order*).  JA____.

On May 15, 1997 AT&T officially indicated it was relying on its existing rates for compliance with the Commission's orders by filing cost data with the ICC purportedly supporting the existing tariffed rates as cost based. *ICC Order*, p. 6.

On December 17, 1997, the ICC granted IPTA's request to investigate AT&T's rates for NST compliance and the IXC request to determine if AT&T complied with the Section 276(a) provisions prohibiting subsidies and opend a new docket on the ICC's own motion to conduct the investigation. *ICC Order*, p. 2; *see also ICC Docket No. 97-0255 Order*, p. 13.  The follow up Docket 98-0195 was opened on March 11, 1998 to investigate the matters proffered by the IPTA. *ICC Order*, pp. 2-3; *Illinois Commerce Commission On Its Own Motion,* Initiating Order, ICC Docket No. 98-0195, March 11, 1998, 1998 WL 34302524.  JA____.

After hearings and the parties had filed their initial briefs in ICC Docket No. 98-0195, the Commission issued the *Wisconsin Payphone Order*.  The ICC ordered a new round of hearings for the parties to address the matters therein.  After this second round of hearings the ICC found AT&T's rates were excessive and not in compliance with the Commission's NST. AT&T was ordered to file NST-compliant rates within 30 days. *ICC Order*, pp. 34 – 37, 46 Finding 20, 47.

Despite finding that AT&T's rates had not been NST-compliant from April 15, 1997 through November, 2003 the ICC denied the IPTA's request for refunds. According to the ICC, the federal filed rate doctrine announced in *Arizona Grocery Co. v. Atchison, T. & S.F. Ty. Co.,* 284 U.S. 370 (1932) and the corresponding Illinois filed rate doctrine prohibited the issuance of refunds since the AT&T tariff rates had been approved by the state commission before the 1996 Act. The ICC did not address that the state regulatory requirements were preempted by the 1996 Act and the Commission's *Initial Payphone Order. See ICC Order*, pp. 42 – 43.

The IPTA submitted that since AT&T was required to have actual NST-compliant rates in effect no later than April 15, 1997, the ICC was required to order refunds to effectuate the federal requirements. Furthermore, the record established AT&T had overcharged the IPTA members millions of dollars in excess charges while AT&T collected hundreds of millions of dollars in DAC since April 15, 1997 before it was eligible under the Commission's orders. The ICC failed to enforce these requirements. *IPTA FCC Petition*, pp. 16-17. JA___; Reply Comments of the IPTA on the IPTA Petition for a Declaratory Ruling, Attachment B. JA___.

To preserve its rights, IPTA appealed the ICC order in the state appellate court. It also filed a motion with the court for primary jurisdiction referral to the Commission for a ruling on what remedies are available once it was established at

hearing that a BOC was in violation of the Section 276 requirements. AT&T opposed the stay and referral. The motion was denied. IPTA then filed the instant petition for declaratory ruling with the Commission on July 30, 2004. See IPTA Reply to AT&T and Verizon Preemption Comments of March 23, 2009 (IPTA Reply To BOCs Comments), p. 48 fn 9. JA ___.

While the instant petition was pending, the Illinois Appellate Court affirmed the *ICC Order* on the basis refunds were barred by the federal filed rate doctrine and the corresponding state filed rate doctrine. The Court did not rule on AT&T's collection of DAC before it was eligible finding the association lacked standing on the issue. *IPTA v. ICC,* No. 1-04-0225 (unpublished) (1st Dist. 2005). JA ___.

While awaiting a Commission order on the IPTA FCC Petition, IPTA petitioned for leave to appeal to the Illinois Supreme Court and for *certiorari* to the United States Supreme Court, requesting the courts to either issue a stay on the petition or issue a referral to the Commission to obtain a decision on the pending petition. These requests were denied. IPTA Reply To BOCs Comments, p. 48 fn 9.

**B.     New York**

In New York, the Verizon rates for Basic Telephone Services to PSPs had been in effect for many years before 1997. IPANY complained to the New York Public Service Commission (NYPSC) in January, 1997 about Verizon's failure to

file new NST-compliant rates and actively participated in state commission

proceedings addressing Verizon's rates from that date forward.  Verizon asserted

its rates were NST compliant and filed no changes by the May 19, 1997 deadline.

When the NYPSC had taken no action by December, 1999, IPANY filed a second

complaint asking the NYPSC to complete the task of reviewing Verizon's rates,

setting new NST-compliant rates, and awarding refunds.  JA ___.

IPANY cited the *Payphone Orders*, *Wisconsin Bureau Order*, *Second

Bureau Waiver Order* and RBOC Coalition Letters of April 10 and 11, 1997,

which promised refunds back to April 15, 1997.  By Order of October 12, 2000,

(*NYPSC October Order*) the NYPSC held the *Wisconsin Bureau Order* did not

apply in New York, and approved Verizon's existing rates as NST-compliant on

the ground they covered "embedded costs".  The NYPSC did not address the issue

of refunds.  JA___.  The NYPSC denied reconsideration on September 21, 2001.

JA___. (Collectively, *NYPSC Orders*)

IPANY challenged the NYPSC's orders and brought all of the

Commission's orders – including the *Wisconsin Payphone Order* (issued after the

*NYPSC Orders*) to the attention of the Supreme Court, the trial level court in New

York.  The Supreme Court set the *NYPSC Orders* aside as improper because the

Commission specified the NST required "forward looking" costs – the opposite of

embedded costs.  The trial court ordered a remand to the NYPSC and directed the

award of refunds back to April 15, 1997 if, using what the trial court considered the proper NST standard, Verizon's old rates were found non-compliant. Critically, however, the trial court held that on remand, in determining NST compliance, the NYPSC could not apply any Commission order issued after April 15, 1997. This precluded the NYPSC from following either the *Wisconsin Bureau Order* or the *Wisconsin Payphone Order.*

Both IPANY and Verizon appealed the trial court order. The Appellate Division agreed that the NYPSC had improperly approved the pre-existing rates as NST-compliant and upheld the remand. It also upheld the trial court's refusal to allow the NYPSC to apply either of the *Wisconsin Orders* to determine if the old rates were NST compliant. But the Appellate Division overturned the trial court on the availability of refunds, holding the *Second Bureau Waiver Order* permitted refunds only for the 45 day period between April 15, 1997 and May 29, 1997.

IPANY asked the New York Court of Appeals to grant leave to appeal and to stay proceedings until the FCC ruled on what standards to apply and whether refunds were available. Both requests were denied.

In March, 2003, a group of individual PSPs filed another complaint with the NYPSC urging it to review the pre-existing Verizon rates by applying both *Wisconsin Orders*, to set new rates, and to issue refunds. JA____. The NYPSC proceeded in Dockets 03-C-0428 and 03-C-0519 to apply both *Wisconsin Orders*,

and on June 30, 2006 ordered Verizon to file NST-compliant rates which were significantly lower than the 1997 rates.  JA___.  However, the NYPSC declined to follow the court orders on remand to conduct review of whether the 1997 rates were NST compliant until the Commission ruled on the pending petitions stating whether refunds were permissible.  JA__ .

The status of the claims in New York is as follows:  a court order for a remand to examine Verizon's 1997 rates for NST compliance remains in effect but the NYPSC is prohibited from applying either of the *Wisconsin Orders* to determine if rates were NST compliant in 1997; the New York courts have interpreted the *Second Bureau Waiver Order* as holding refunds are limited to between April 15, 1997 and May19, 1997; and the NYPSC has stated it will not conduct the remand on either the original 1997 and 1999 IPANY complaints, or the 2003 PSPs' complaint, until the Commission and the federal courts declare whether refunds are required.

### C.    Ohio

In December, 1996 the Public Utilities Commission of Ohio (PUCO) directed all incumbent local exchange companies operating in Ohio to file tariffs consistent with the requirements of Section 276 and the Commission's orders by January 15, 1997. On April 8, 1997, PAO timely filed a motion to intervene. Shortly thereafter, PAO filed a motion with PUCO requesting an evidentiary hearing to

determine whether AT&T tariffs were compliant with the requirements of the 1996 Act, the Commission's orders, and the PUCO orders implementing the federal requirements.   On September 25, 1997, without holding an evidentiary hearing, PUCO approved AT&T's payphone access tariff as consistent with the 1996 Act, Commission's decisions, and PUCO 's orders.  JA__ .

In January, 1999 – about a year and half *after* it had approved AT&T tariffs – PUCO finally granted the PAO motion for an evidentiary hearing. PUCO belatedly decided that "there is insufficient evidence … that the payphone tariffs of [several companies including AT&T] fully comply with the requirements of Section 276 of the 1996 Act and the rules subsequently promulgated by the FCC." JA___.  In November, 2002, PUCO expanded the scope of the proceeding to investigate whether AT&T's tariffs complied with the NST.  However, although the association had timely and persistently requested PUCO to order refunds back to April 15, 1997, PUCO refused to even consider refunds because it considered that ordering refunds would amount to improper retroactive ratemaking. PUCO Comments, p. 5, 14-16. JA___.

In November, 2002 PUCO established reduced interim rates for payphone services and ordered that interim rates collected by AT&T would be subject to a "true up" once permanent rates were established in the docket.  JA__.  After hearings beginning in January, 2004, PUCO found that AT&T's Basic Telephone Services

rates to PSPs were not NST-compliant. Specifically, PUCO concluded the physical collocation aspects of the pricing "methodology, as applied by (AT&T) in this case, fails to rise to the reasonableness standard of the NST ...." *PUCO Investigation into the Implementation of Section 276 of the Telecommunications Act of 1996 Regarding Pay Telephone Services*, Opinion and Order, Case No. 96-1310-TP-COI, September 1, 2004 (*PUCO Order*), p. 30. JA___. Accordingly, PUCO ordered AT&T to tariff lower permanent rates. However, PUCO refused to order refunds of the overcharges back to April 15, 1997. Rather, it ordered AT&T to render an accounting of the overcharges since setting the 2003 interim rates and to refund those amounts. *Id.*, pp. 30-31.

PAO appealed PUCO's refusal to order refunds of overcharges back to April of 1997. The Ohio Supreme Court denied the appeal. The court did not discuss PAO's substantive arguments about the refund issue, but tersely affirmed PUCO's refusal to consider refunds as "not manifestly against the weight of the evidence." *Payphone Association of Ohio v. Public Utilities Commission of Ohio.* 109 Ohio St.3d 453, 849 N.E.2d 4 (2006), ¶16.

## IV.    The Commission *Refund Order* On Review

After the issuance of the *ICC Order*, IPTA filed its petition with the Commission on July 30, 1994. Among its requests it asked the Commission to declare: (1) the IPTA's payphone members were entitled to refunds of the amounts

charged by AT&T for Basic Telephone Services from April 15, 1997 through December 13, 2003 that were in excess of the cost-based rates of the Commission's NST; (2) the ICC's denial of refunds was inconsistent with the Commission's *Payphone Orders* and that the ICC should re-evaluate its denial; (3) whether AT&T was eligible for DAC from April 15, 1997 through December 13, 2003; and (4) for such other relief arising from the facts in ICC Docket No. 98-0195 as deemed necessary to enforce the Commission's *Payphone Orders*.  JA ___.

IPANY filed its petition with the Commission on December 29, 1994. Among its requests it asked the Commission to declare: (1) IPANY's payphone members were entitled to refunds, with interest, of the amounts charged by Verizon for Basic Telephone Services from April 15, 1997 through July 30, 2006 that were in excess of the cost- based rates of the Commission's NST; (2) the New York decision denying any refunds was inconsistent with the Commission's *Payphone Orders* and should be preempted; (3) the Commission direct the NYPSC to apply the two *Wisconsin Orders;* and (4) for such other relief arising from the facts in NYPSC Docket Nos. 96-C-1174 and 99-C-1684 as deemed necessary to enforce the Commission's *Payphone Orders*.  JA ___.

The PAO petition was filed with the Commission on December 28, 2006. Among its requests it asked the Commission to declare: (1) the PAO members

were entitled to refunds of the amounts charged by AT&T for Basic Telephone

Services back to April 15, 1997 that were in excess of the cost-based rates of the

Commission's NST; (2) PUCO's refusal to consider refunds of the AT&T

overcharges was inconsistent with the Commission's *Payphone Orders* and that

PUCO should re-evaluate its decision; and (3) for such other relief arising from the

facts in PUCO Case No. 96-1310-TP-COI as deemed necessary to enforce the

Commission's *Payphone Orders*.  JA ___.

     For over eight years the associations annually had multiple *ex parte*

meetings with the Commission seeking a declaratory ruling on their petitions.

Finally on February 27, 2013, the Commission issued the instant *Refund Order*.  In

the order the Commission agreed refunds are available back to April 15, 1997 for

BOC charges to PSPs to the extent the charges exceeded cost-based rates

compliant with the NST.  *Refund Order*, ¶47.  The Commission further found that

where a state commission determines a BOC's rates were not NST-compliant, even

though the BOC had certified that they were and the BOC had been collecting

DAC, this presented a strong argument that refunds should be ordered.  *Id.,* ¶38 fn.

161.

     However, the Commission decided it would leave the decision of whether to

provide refunds up to each state based on reasons specific to each state's own

analysis.  The Commission stated that: in Illinois the state commission rejected

refunds because of the filed tariff doctrine and the association's failure to file a

formal complaint; in New York the courts ruled the association failed to exhaust its

administrative remedies; and in Ohio the state commission concluded refunds were

prohibited by the state prohibition against retroactive ratemaking and the filed rate

doctrine.  The Commission did not question these decisions.  *Id.,* ¶41.  Two other

state association petitions were denied as well.  *Id.*  Meanwhile several other states

were ordering refunds, which the Commission did not question either.  *Id.,* ¶48.

Since the Commission held it was leaving it to the states to decide whether refunds

were appropriate, it found that having different state decisions was not inconsistent

with the Commission's regulations or the statute. *Id.,* ¶37.  The Commission

rejected the argument this was an improper subdelegation to the states.  *Id.,* ¶42.  It

also summarily rejected the petitions requesting the Commission to determine the

BOCs were not entitled to begin collecting DAC as of April 15, 1997. JA___.  *Id.,*

¶38, fn. 161.

Over the strong dissent of Commissioner Clyburn, the Commission denied

the Illinois, New York and Ohio petitions.

## SUMMARY OF ARGUMENT

In enacting Section 276 of the 1996 Act, Congress unambiguously directed

that after the effective date of the rules prescribed in subsection (b) a BOC is

prohibited (1) from subsidizing its payphone service directly or indirectly from its

telephone exchange operations or exchange access operations and (2) from preferring or discriminating in favor of its payphone service. 47 U.S.C. §276(a). Subsection (b) further required the Commission to prescribe regulations implementing the provisions of paragraphs (1) and (2) of subsection (a) by November 8, 1996.

The Commission prescribed regulations requiring the BOCs to provide basic phone services to competing PSPs at cost-based rates that complied with the Commission's *Computer III* safeguards. The methodology for setting rates is referred to as the New Services Test. The Commission found NST-compliant rates were required to comply with the statute's prohibitions in Section 276(a). Any state requirements for non-cost-based rates were expressly preempted after the rule's effective date of April 15, 1997.

Yet, after state hearings established that AT&T and Verizon continuously charged rates in excess of the NST-compliant rates for years after the effective date of the rule, the Commission has failed to enforce these statutory prohibitions in the *Refund Order*. Such action, or lack thereof, is inconsistent with the statute and in defiance of the commands of Congress.

The *Refund Order* also fails to enforce the Congressional mandate for a uniform nationwide federal program. Congress enacted Section 276 to replace traditional state regulation of payphone services and create a national pro-

competitive deregulatory framework. This overarching federal program is
necessary to achieve Congress' goal of eliminating subsidies and discrimination to
promote competition and the widespread deployment of payphones. The
importance of federal control is driven home by Section 276(c) which preempts
"any State requirements . . . inconsistent with the Commission's regulations"
implementing the statute. The Commission has been given an express mandate to
preempt state regulation in implementing Section 276.

In the *Refund Order* the Commission held each state may make its own
determination of whether to provide refunds to correct violations of the
requirement for NST-compliant rates for any period after April 15, 1997. This
includes permitting states to reach diametrically opposite positions to each other,
and to the Commission, on the same circumstances and under the same federal
requirements. Permitting inconsistent and irreconcilable state enforcement of the
Section 276 requirements is inconsistent with the uniform national requirements
mandated by Congress.

In addition to the *Refund Order*'s failure to enforce the Section 276(a)
prohibitions after the April 15, 1997 effective date of the rules (see Argument
II.A.) and the Section 276(c) mandate against inconsistent state regulations (see
Argument II.B.), the Commission's decision that refunds of non-NST-compliant
tariffed rates are available, but that individual states may bar those refunds because

of the filed rate doctrine and the prohibition against retroactive ratemaking,

constitutes arbitrary and capricious decisionmaking.   These policies similarly

maintain that the rates listed in a filed tariff may not be subsequently altered or

retroactively changed by the issuance of a refund of the tariffed rate.  However, the

Courts of Appeals that have specifically addressed this issue have found that

neither the state nor the federal filed rate doctrines would bar refunds under

Section 276 of non-NST-compliant rates.

     The Commission fails to reconcile or justify its contrary position with these

decisions.  Nor does the Commission provide a reasonable explanation as to how

the Commission can find that refunds are available regardless of the federal filed

rate doctrine and the prohibition against retroactive ratemaking, but that state

doctrines based on these federal doctrines may prohibit refunds.

     Furthermore, in light of the statute's preemption of inconsistent state

regulations, the Commission fails to justify how diametrically contradictory refund

decisions could be allowed in various states that follow similar filed rate and

retroactive rulemaking policies.  Moreover this Court and the Commission have

previously found that charges may be retroactively adjusted to comply with the

Section 276 requirements.  Based on the record, the Commission's failure to

provide a reasonable justification of its denial of refunds to the Petitioners

constitutes arbitrary and capricious decisionmaking.

The Commission's passing reference to *dicta* in the *ICC Order* that the IPTA failed to file a formal complaint cannot justify a denial of refunds because the indisputable facts of record establish the *ICC Order* was itself resolving the verified complaint filed by the Illinois Association on May 8, 1997.  Neither the *ICC Order*, the Illinois Appellate Court opinion, nor the ICC Comments filed in the instant proceeding claim the denial of refunds was on this false basis.

A similar Commission misstatement that IPANY was denied refunds for failing to exhaust administrative remedies is unsupported by the facts of record and unjustified by the Commission.  No finding was made that IPANY failed to exhaust administrative remedies for refunds.  The New York Court refused to apply the Commission's NST requirements back to rates in effect on April 15, 1997, in contradiction to the holdings of the Commission and this Court.

Also, through numerous orders the Commission repeatedly held that AT&T and Verizon would not be eligible to receive DAC under Section 276(b)(1)(A) until they were in actual compliance with the NST requirement.  Although the Commission procedurally authorized the BOCs to begin receiving DAC payments upon their self certifications they had completed all of the requirements for eligibility, the Commission repeatedly emphasized that the self certification did not substitute for the obligation to be in actual compliance to be eligible for compensation.

The Commission stated it and the state commissions would be responsible to enforce these requirements. The state proceedings established the rates were not in actual NST compliance at the time of the BOCs' certifications and that the BOCs had been receiving DAC for years without being in compliance with the NST requirement. But without any reasonable basis and without explaining its departure from its previous rulings, the Commission changed its policy and refused to sustain its past orders that the BOCs were not eligible for the compensation. This change in policy was made without (1) factual support, (2) response to the evidence of record regarding the BOCs' repeated failure to comply, or (3) a reasonable justification. The Commission's failure to justify its change in policy was arbitrary and capricious.

Lastly, the Commission's sub-delegation to the states of the authority to determine the remedy for the BOCs' failure to have NST-compliant rates was unlawful. Congress intended a single federal regimen for payphones and charged the Commission with enforcement. The Commission was without authority to allow each state to determine whether there should be refunds of charges above the required rate without supervising the states and could not simply defer to the states to prescribe or prohibit remedies for the BOC overcharges. Congress charged the Commission with enforcement of Section 276 and the Commission was without authority to delegate its decisionmaking authority to the states.

## ARGUMENT

State hearings established AT&T and Verizon violations of the statute, rules, regulations and eight Commission orders requiring the BOCs to provide local phone services to competing PSPs at cost-based rates that complied with the NST. Although the *Refund Order* agrees with the Petitioners' long-argued position, and that taken by the Federal Courts of Appeal and most state commissions, that such excessive charges should be refunded to the PSPs, the Commission fails to order refunds in the Petitioners' three states because those states had previously reached a different conclusion that no remedy was available. The Commission further permitted AT&T and Verizon to retain millions of dollars in DAC they received in exchange for actual compliance with the cost-based rate requirements. The Commission's failure to implement the commands of Congress is inconsistent with the statute, constitutes arbitrary and capricious decisionmaking, and is an improper delegation of the duties imposed on the Commission by Congress.

Petitioners ask this Court to vacate those portions of the order and to remand the order to the Commission with directions to require AT&T and Verizon to refund to Petitioners' members all overcharges back to April 15, 1997, to require the NYPSC to apply the Commission's requirements found in the *Wisconsin Payphone Order* for rates effective on and after April 15, 1997, and to decide

whether the BOCs' violations of this requirement should result in forfeiture of the

DAC collected before the BOCs were eligible in light of this Court's decision.

## I.     Standard Of Review.

The standard of review of the Commission's order is defined by the

Administrative Procedures Act, which states the reviewing court shall hold

unlawful and set aside agency actions, findings, and conclusions of law found to be

arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with

law.  5 U.S.C. §706(2)(a).  In analyzing whether the Commission's decision is in

accordance with the 1996 Act, the Court applies the two step framework of

*Chevron U.S.A. Inc. v. Natural Resources Defense Council, Inc.*, 467 U.S. 837, 104

S.Ct. 2778, 81 L.Ed.2d 694 (1984).  The Court first asks "whether Congress has

directly spoken to the precise question at issue," in which case the court "must give

effect to the unambiguously expressed intent of Congress."  *Id.* at 842 – 43, 104

S.Ct. 2778.  If the statute is silent or ambiguous with respect to the specific issue,

the court moves to the second step and defers to the agency's interpretation as long

as it is "based on a permissible construction of the statute," *Id.* at 843, 104 S.Ct.

2778, and is "reasonable in light of the Act's text, legislative history, and purpose."

*Southern Cal. Edison Co. v FERC*, 116 F.3d 507, 511 (D.C. Cir.1997); *Global

Crossing Telecommunications, Inc. v. FCC*, 259 F.3d 740, 744 (D.C. Cir.2001).

The Commission's decision must be consistent with the statute. *Illinois Public Telecommunications Association v. FCC*, 117 F.3d 555, 565-66 (D.C. Cir. 1997). It must provide a reasonable justification, supported by the facts of record, and representing reasoned decisionmaking. *Id.*, 117 F.3d 563-66. It is arbitrary and capricious for the Commission to reach an *ipse dixit* conclusion, while failing to respond to contrary arguments and ignoring record evidence. *Id.*, 117 F.3d at 563-64. An agency changing its course is obligated to provide a reasoned analysis for the change. *Motor Vehicle Mfrs. Ass'n of United States, Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 42, 103 S.Ct. 2856 (1983).

## II. The Commission's Refund Order Is Inconsistent With Section 276(a) And With Section 276(c) Of The Statute.

### A. The Commission's refusal to order refunds is inconsistent with Congress' unambiguously expressed command in Section 276(a) prohibiting subsidies and discrimination after the April 15, 1997 effective date of the rules promulgated under Section 276(b)(1)(C).

In Section 276(a) Congress has directly spoken on the issue of what is prohibited by the statute. Therefore the *Chevron* inquiry stops at the first step and the Commission "must give effect to the unambiguously expressed intent of Congress", which the Commission failed to do in the *Refund Order*.

It is a violation of Section 276(a) for a BOC to subsidize or discriminate in favor of its payphone services after the April 15, 1997 effective date of the

Commission's rules issued under subsection (b) implementing the provisions of

paragraphs (1) and (2) of subparagraph (a).

> (1)    Nondiscrimination safeguards
> After the effective date of the rules prescribed pursuant to subsection
> (b) of this section, any Bell operating company that provides payphone service –
> (a)    shall not subsidize its payphone service directly or indirectly from its telephone exchange service operations or its exchange access operations; and
>
> (b)    shall not prefer or discriminate in favor of its payphone service.

47 U.S.C. §276(a).

The Commission has determined that BOC rates to competing PSPs for local

phone services, such as the line, usage, and central office features (Basic

Telephone Services), that are not cost based in compliance with the Commission's

NST violate the Section 276(a) prohibitions against subsidies and discrimination.

*Initial Payphone Order*, ¶¶146-47; *Payphone Reconsideration Order,* ¶¶146-47,

162-63, 199; *Wisconsin Payphone Order,* ¶12.

The Commission issued rules pursuant to Section 276(b)(1)(C) requiring the

BOC Basic Telephone Service rates to be cost based and NST-compliant by no

later than April 15, 1997. *Initial Payphone Order*, ¶146; *Payphone*

*Reconsideration Order*, ¶¶130-31, 163; *First Bureau Waiver Order*, ¶¶2, 30, 35;

*Second Bureau Waiver Order*, ¶¶10, 24. 25. The Commission has repeatedly

found this requirement necessary to comply with the statutory mandate to advance the twin goals established by Congress in Section 276. *Initial Payphone Order*, ¶¶1-4; *Payphone Reconsideration Order*, ¶¶1-2; *First Bureau Waiver Order*, ¶3; *Second Bureau Waiver Order*, ¶3; *Wisconsin Payphone Order*, ¶2.

State hearings established the BOC Basic Telephone Service rates did not comply with the NST for many years after the April 15, 1997 effective date of the rule, thereby subsidizing and discriminating in favor of their payphone services long after the statutory prohibition was in effect. In Illinois, the AT&T Illinois rates exceeded the Commission's cost-based rate requirement continuously for over six years after the rule's effective date. Not until December 13, 2003 did AT&T Illinois file NST-compliant rates. *ICC Order*, p. 42 Finding 20, p.47 Ordering Clause - requiring NST-compliant rates to be filed within 30 days. In Ohio, the PUCO found that AT&T Ohio did not have NST-compliant rates until 2003. JA___. In New York, Verizon did not have NST-compliant rates until 2006. JA___. The rates charged to all three Petitioners' members were in violation of the statutory prohibitions of Section 276(a) after the April 15, 1997 effective date of the Commission's rules. Yet despite the violations of the statute, these states failed to require refunds or any other correction for these years of overcharges. By accepting these state decisions, the *Refund Order* fails to enforce the 1996 Act or to rectify the violations.

Leaving the BOCs' massive, long-term noncompliance unremedied is not a permissible option. It would be equivalent to making a decision that it is not necessary for the Commission to implement or enforce the requirements of Section 276. However, the statute places the responsibility for implementing and enforcing its requirements squarely on the Commission. The Commission has no authority to ignore, excuse or waive the BOCs' noncompliance.

By ruling the BOCs must provide refunds of the excessive payphone line charges, the Court and the Commission not only will ensure the payphone providers as the injured parties are made whole, but also will correct the BOCs' violation of Section 276(a) by providing retroactive compliance back to April 15, 1997. This would ensure, notwithstanding the utter lack of timely compliance with the NST, that the Commission's Section 276(b)(1)(C) regulations do, ultimately, implement the provisions of Section 276(a) "(a)fter the (April 15, 1997) effective date of the rules prescribed pursuant to subsection (b)".

The Court should reverse the Commission's order and remand the case with directions to require the issuance of refunds, with interest, for all charges to Petitioners' members after April 15, 1997 that exceeded NST-compliant rates.

**B.    The Commission's refusal to order refunds is inconsistent with Section 276(c) and Congress' creation of a uniform nationwide pro-competitive deregulatory framework that specifically preempts any inconsistent state requirements.**

The BOCs in every state were required by the Commission to have tariffed NST-compliant rates. *Payphone Reconsideration Order*, ¶163. Since all rates to PSPs were tariffed, the underlying premises and policy considerations of the filed rate doctrine and of the prohibition against retroactive ratemaking would have equal application to every state. Yet under the *Refund Order*, in some states PSPs may receive refunds of tariffed rates going back to April 15, 1997 to enforce the Section 276(a) prohibitions, while in other states PSPs are barred from refunds of tariffed rates despite proving similar violations of Section 276(a) going back to April 15, 1997. It is unreasonable and irreconcilable for the Commission to claim that diametrically opposed positions on the same point satisfy the Congressionally mandated consistency for state requirements found in Section 276(c).

The Commission's position is the antithesis of a comprehensive uniform nationwide federal scheme. Not only do the filed rate doctrine and the prohibition against retroactive ratemaking not prohibit refunds,[3] the Commission agrees refunds of the tariffed rates are available. *Refund Order*, ¶47. For any state to

---

[3] *See Davel Communications, Inc. v. Qwest Corp.*, 460 F.3d 1075 (9th Cir.2006), *TON Services, Inc. v. Qwest Corp.*, 493 F.3d 1225 (10th Cir.2007). *See also Implementation of the Pay Telephone Reclassification and Compensation Provisions of the Telecommunications Act of 1996*, CC Docket 96-128, FCC 02-292, released October 23, 2002, 17 F.C.C.R. 21274 (2002), ¶62 fn. 106 & 107 (*Fifth Payphone Order*).

40

impose a requirement resulting in the opposite conclusion is *per se* inconsistent with the statute and with the Commission's orders.

Furthermore, a state's refusal to enforce the prohibitions against subsidies and discrimination for any period after April 15, 1997 is itself inconsistent with the statute and the Commission's orders and regulations.  Finding that AT&T and Verizon violated the Section 276(a) prohibitions after the Commission's rule went into effect, but permitting the violations to go unremedied is inconsistent with the Commission's regulations and numerous orders prohibiting such conduct.   For the Commission to allow state requirements to bar or not bar refunds based on the filed rate doctrine and the prohibition against retroactive ratemaking, when the federal courts and the Commission have decided that these doctrines do not bar refunds, is not a permissible construction of the statute's express preemption of inconsistent state requirements.   Nor is it reasonable in light of the Act's text, legislative history, and purpose.

## III.  The Commission's Refusal To Order Refunds Is Arbitrary, Capricious, Unjustified, Contrary To The Facts Of Record And The Product Of Unreasoned Decisionmaking.

### A.  The Commission's conclusion that refunds of the tariffed rates are available but that individual states may nevertheless hold that refunds of the tariffed rates are not available is not the product of reasoned decisionmaking.

The Commission relied on state filed rate doctrines in rejecting refunds for Petitioners. The filed rate doctrine prohibits a telecommunications carrier from

charging a customer either more or less than the published tariff rate. *AT&T v. Central Office Telephone, Inc.*, 524 U.S. 214, 227, 118 S.Ct. 1956 (1998). It even bars the carrier and the customer from agreeing to a rate different from the tariff. *Maislin Industries, U.S., Inc. v. Primary Steel, Inc.*, 497 U.S. 116, 110 S.Ct. 2759 (1990). Similarly, the prohibition against retroactive ratemaking prohibits retroactively changing the tariffed rate that was previously fixed by the Commission. *Verizon Telephone Companies v. FCC*, 269 F.3d 1098 (D.C. Cir. 2001). Both doctrines have been employed to prohibit refunds of tariffed charges once paid. *Id.*, 269 F.3d at 1107. However, they are not applicable where, as here, refunds are permitted, or required, to enforce the comprehensive scheme provided by the statute and the regulations that gives rise to the tariff requirement in the first place. *Davel Communications,* 460 F.3d at 1085, *citing Reiter v. Cooper*, 507 U.S. 507, 266, 113 S.Ct.1213; *in accord TON Services.*

### 1. The filed rate doctrine and the prohibition against retroactive ratemaking do not bar refunds.

As noted in Commissioner Clyburn's dissent, but wholly omitted without explanation in the Commission's *Refund Order,* the U.S. Courts of Appeals have directly addressed the issue of refunds where a BOC's tariffed rates were not NST-compliant and have unanimously agreed these theories do not prevent the refund of overcharges. *Davel Communications*; *TON Services*. The Courts found this is true regardless of whether the doctrines are based on state or federal grounds. Yet, in

upholding totally contradictory state decisions in Illinois, New York, and Ohio, the Commission fails to address, much less justify, how its decision reconciles with the opposite determinations made by the Federal Courts. .

It is common for states to have regulatory requirements with state filed rate doctrines or prohibitions against retroactive ratemaking. In the *TON Services* proceeding, the Court noted that all 13 states in which the PSP operated had state filed rate doctrines. But the Tenth Circuit held that Congress had preempted these state doctrines through Section 276(c). *TON Services*, 493 F.3d at 1228, 1236 fn. 14.

Addressing the federal filed rate doctrine, the Courts further found the doctrine does not bar enforcement of the commands of the very regulatory statute giving rise to the tariff filing requirement, even if the effect of the enforcement would be to change the filed tariff. "Because '(c)arriers must comply with the comprehensive scheme provided by the statute and regulations promulgated under it(,)' the failure to comply 'may justify departure from the filed rate.' *ICC v. Transcon Lines*, 513 U.S. 138, 147, 115 S.Ct. 689 (1995)." *TON Services*, 493 F.3d at 1237; *see also Davel Communications*, 460 F.3d at 1085 ("the filed-tariff doctrine does not bar a suit to enforce a command of the very regulatory statute giving rise to the tariff-filing requirement, even where the effect of enforcement would be to change the filed tariff.") .

43

The purpose of the filed rate doctrine is to prevent the discrimination prohibited by Congress. *Keogh v Chicago & N. W. Ry. Co. et al.,* 260 U.S. 156, 163 (1922). Similarly, a key purpose of the NST requirement is to prohibit the BOC discrimination that is prohibited by Congress. 47 U.S.C. §276(a)(2) & (b)(1)(C); *Initial Payphone Order,* ¶¶146-47, 199; *New England Public Communications Council, Inc. v. FCC*, 334 F.3d 69, 78 (D.C. Cir. 2003). Section 276(a) prohibited non-cost-based rates in excess of the NST after April 15, 1997 as required by the Commission's rules promulgated under Section 276(b)(1)(C). The Courts found enforcement of that statutory scheme through the refund of charges that exceeded the requirement would not be prohibited. *Davel Communications*, 460 F.3d at 1085; *TON Services*, 493 F.3d at 1236-37. Consequently, the PSPs in the *Davel Communications* and the *TON Services* states have received refunds regardless of the existence of either the state or the federal filed rate doctrine. JA _.

### 2. The Commission's unjustified decision to allow inconsistent state applications of the same doctrines is arbitrary and capricious.

The state doctrines are based on the federal doctrines and rest on the same federal principles expressed by the Supreme Court in *Arizona Grocery v. Atchison, T. & S.F. Ry Co.*, 284 U.S. 370, 52 S.Ct. 183 (1932). *See* Illinois Appellate Court Opinion at p. 6. JA ____ ("In *Mandel Brothers*, the Illinois Supreme Court adopted the reasoning of *Arizona Grocery Co.*"); see also other states' discussions of the

federal basis for the state doctrines: *Safehouse Progressive Alliance for Nonviolence v. Qwest,* 174 P.3d 821, 826 (CO 2007); *Teleconnect Co. v. US West Communications, Inc.,* 508 N.W.2d 644, 647 (IA 1993); *N.C. Steel v. National Council*, 123 N.C.App. 163, 170-72, 472 S.E.2d 578 (1996); *Valdez v. State*, 132 N.M. 667, 670-71, 54 P.3d 71 (2002); *Prentice v. Title Ins. Co. of Minnesota*, 176 Wis.2d 714, 721-24, 500 N.W.2d 658 (1993). Yet the Commission failed to provide any reasonable justification for a state to take a position on the same doctrines that is wholly at odds with the analysis and determination made by the Federal Courts and the Commission. Its failure to reconcile these antithetical positions is arbitrary and capricious.

Not only did the Commission fail to reconcile the state decisions barring refunds with the federal decisions granting refunds under the same facts, the Commission failed to reconcile or justify the decisions of the states with state filed rate doctrines that inconsistently held that refunds were either permitted or denied. Regardless that the states reached irreconcilably opposite conclusions on whether refunds were permitted in states with filed rate doctrines, the Commission held that they were all correct. *See Refund Order*, ¶¶37-41, 48. *Cf.* Illinois and Ohio decisions that the filed rate doctrines barred refunds with the Michigan decision that neither the prohibition against retroactive ratemaking nor the filed rate doctrine prohibit refunds of charges in excess of the NST. *SBC Michigan v.*

*Michigan PSC,* 2006 WL 2787891 citing *In re MCI Telecom Complaint,* 255

Mich.App.361, 366, 661 N.W.2d 611 (2003).  Compare also with the issuance of

refunds in Colorado, Iowa, North Carolina, New Mexico, Utah, and Wisconsin,

among others, all of which have state filed rate doctrines.  JA ___.  *See also TON*

*Services*, 493 F.3d at 1228, 1236 (refunds not barred in any of those 13 states with

state filed rate doctrines).

　　　No explanation is provided other than the Commission's statement it has

allowed the states to make their own determination.  *Refund Order*, ¶40.  The

Commission wholly ignores the inconsistencies submitted of record.  At other

times when states have reached inconsistent determinations, such as in the

application of the NST, the Commission has ordered them to conform to the

uniform national approach required under Section 276.  *See Refund Order*, ¶¶53-

55, remanding the Michigan commission's NST determination for conformance

with the Commission's implementation of Section 276.  *See also In the Matter of*

*North Carolina Payphone Association Petition for Declaratory Ruling,* CCB/CPD

No. 99-27, *Oklahoma Local Exchange Carrier Petition for Declaratory Ruling,*

CCB/CPD No. 99-31, and *Michigan Payphone Association Petition for*

*Declaratory Ruling,* CCB/CPD No. 99-35, released March 5, 2002, 17 F.C.C.R.

4275 remanding state decisions for being inconsistent with the Commission.

However in the *Refund Order*, without reasoned justification, the Commission

refused to order relief on a uniform national basis, leaving it to individual states to

make inconsistent determinations about whether they will remedy the violations

and enforce federal law.  The Commission has failed to establish as a binding rule

that uniform federal law – not inconsistent state laws – govern enforcement and the

remedy.

> **3.      The Commission's failure to order refunds is inconsistent
> with both this Court's direction and the Commission's own
> precedent in Section 276 cases.**

In a previous review of Section 276(b)(1), which also governs the NST-

requirements, this Court noted that Congress required the Commission to prescribe

by November 8, 1996 regulations ensuring fair compensation for dial around calls.

In order to implement the statutory requirements after that date, the Court stated

the Commission had the authority to adjust the compensation rate retroactively and

order refunds where overcompensation occurred.  *MCI Telecom. Corp. v. FCC*,

143 F.3d 606, 609 (D.C. Cir. 1998).

Petitioners' PSPs were required to pay AT&T and Verizon, among others,

payments received by the PSPs going back to October 7, 1997 for DAC that

exceeded the lawful rate later determined to comply with Section 276.

*Implementation of the Pay Telephone Reclassification and Compensation*

*Provisions of the Telecommunications Act of 1996*, CC Docket 96-128, Third

Report and Order and Order on Reconsideration of the Second Report and Order,

released February 4, 1999, 14 F.C.C.R. 2545 (1999), ¶¶195 – 98 (*Third Payphone Order*), and *Fifth Payphone Order*, ¶94.

Yet in the instant case, the Commission has failed to order AT&T and Verizon to pay back to the PSPs the overcharges that exceeded the lawful NST rate later determined to comply with Section 276.  The Commission's failure to order refunds is not only inconsistent with the 1996 Act, it is inconsistent with the precedents of this Court and the Commission and arbitrary and capricious decision making.

Although the Ninth, Tenth, and D.C. Circuits and the Commission have all held retroactive adjustment to the rates required under Section 276 are not prohibited, the *Refund Order* permits individual states to reach the opposite determination.  No reasonable justification is offered by the Commission other than to note that is what the state decided.  The Commission's *ipse dixit* conclusion to accept these state decisions on these doctrines, in contrast to the determinations of the Federal Courts, the Commission's own approval of refunds, and the contrary decisions of other states, together with the Commission's failure to respond or justify these inconsistencies, epitomizes arbitrary and capricious decisionmaking.[4]

---

[4] The New York courts interpreted the *Second Bureau Waiver Order* as limiting refunds to 45 days.  That is clearly at odds with the *Refund Order*.  Id., ¶¶45-46.

**B.     The Commission's statement that the ICC's refusal to order refunds was justified on the IPTA's failure to file a formal complaint is contrary to the facts of record.**

The ICC found the AT&T rates for Basic Telephone Services were not compliant with the NST and exceeded the rates permitted by Section 276(a) and the Commission's rules and orders.  However, the ICC held refunds of AT&T's over six years of excessive charges were barred by the federal and state filed rate doctrines.  In *dicta* the state commission said that from the time the Commission established the NST until the date of the state commission order the IPTA had not filed any complaint to formally challenge the AT&T rates.  This *non sequitur* was made despite the facts, as recognized in the order itself, that the order was to resolve the IPTA's verified petition filed on May 8, 1997 challenging the AT&T rates and requesting refunds of the overcharges.  *ICC Order*, pp. 2-3.  Under the Illinois Public Utilities Act a complaint is brought before the ICC either by petition or complaint. 220 ILCS 5/10-108.

Although neither the Illinois Appellate Court, nor the ICC in its filings before the Commission, make any claim the *dicta* formed any basis for the denial of refunds, the *Refund Order* repeats the *dicta* for support of the denial.  *Refund Order*, ¶41.  The record clearly establishes that not only did Illinois not deny refunds on that basis, but the facts before the ICC and this Commission irrefutably

establish the IPTA filed a verified petition on May 8, 1997 initiating ICC Docket No. 97-0255. The ICC's order in that proceeding reflects the IPTA's request.

## II.  IPTA REQUEST FOR INVESTIGATION

The IPTA seeks an investigation on the following three issues:

> (1)    Whether the LECs provide network services to payphone providers at a price that complies with the federally-mandated "New Services Test" (47 C F R §6149(g)(2)), which requires that such services be priced at the long-run service incremental cost ("LRSIC") plus a reasonable allocation of overhead. The investigation would require the Commission to determine the cost-based price under the New Services Test for each network service provided to payphone providers and the amount of refunds, if any, owed to payphone providers who purchased network services from the LECs at rates which were not cost-based; …

*       *       *

## XII.  FINDINGS AND ORDERING PARAGRAPHS

> … (3) the following three matters proffered by the Illinois Public Telephone (sic) Association warrant investigation. LEC compliance with the pricing provisions of the New Services Test in provisioning pay telephone service the necessity of declaring GTE, ICTC and Centel pay telephone services as competitive, and the removal of subsidies from exchange and exchange access services;

*       *       *

> IT IS THEREFORE ORDERED that an investigation should be opened by the Commission on its own motion to explore the matters referred to in finding (3) above.

*Illinois Public Telecommunications Association*, ICC Docket No. 97-0255 (1997), 1997 WL 33772122, pp. 2, 13 (*ICC Docket No. 97-0255 Order*). JA ___.

Pursuant to this order, the ICC opened ICC Docket No. 98-0195 to investigate the above matters. *Illinois Commerce Commission on Its Own Motion*, ICC Docket No. 98-0195 (1998) (order initiating docket) 1998 WL 34302524. JA ___. The Interim Order (which became the final order on this issue) stated it was pursuant to the original petition filed by IPTA on May 8, 1997. *ICC Order*, pp. 2-3. After the state commission denied the refunds, the Illinois Appellate Court affirmed the denial solely on the basis of the filed rate doctrine and prohibition against retroactive ratemaking. The *Refund Order* acknowledged these facts. *Refund Order*, ¶¶15-16.

In the ICC comments filed with the Commission, the ICC does not claim refunds were denied for a failure to file a formal complaint. JA ___. Other than the single unsupported statement once made in *dicta*, this clear error was never stated either before or after by Illinois.

The facts of record do not support any Commission conclusion to the contrary nor provide a reasonable justification for the denial of refunds. The Commission's failure to respond to the contrary facts of record constitutes capricious and arbitrary decisionmaking. *See Illinois Public Telecom. Assn.*, 117 F.3d at 564. ("The FCC's *ipse dixit* conclusion, coupled with its failure to respond

to contrary arguments resting on solid data, epitomizes arbitrary and capricious rulemaking.")  The record establishes that the sole basis for the ICC's denial of refunds was the ICC's claim that refunds are barred by the filed rate doctrine or retroactive ratemaking.  As established elsewhere in this brief, any Commission denial of refunds on that basis would be inconsistent with the statute and would constitute arbitrary and capricious decisionmaking.

**C.     The Commission's statement that the New York refusal to order refunds was justified because of IPANY's failure to exhaust administrative remedies is contrary to the facts of record and irrelevant.**

The New York courts' finding that IPANY failed to exhaust its administrative remedies related solely to the alleged failure to seek a new rate, not to the request for refunds.  Apart from the fact that the record demonstrates the courts' finding was erroneous, it was mooted by subsequent events and could not for that reason form the basis for the Commission to deny refunds.  In any event, the Commission could not deny refunds based on this alleged failure.

The Supreme Court, the initial reviewing court in New York, found IPANY had properly challenged Verizon's pre-existing rates and validly prosecuted its request for refunds.  However, it strangely stated IPANY had failed to ask the NYPSC to set new, NST-compliant replacement rates, and so stated that IPANY "failed to exhaust its administrative remedies" *as to that issue alone.*  It never stated IPANY had failed to exhaust administrative remedies with respect to its

request for refunds; indeed, it specifically held refunds should be awarded if the NYPSC found, on remand, that the pre-existing rates were not NST compliant. JA_____. The Appellate Division, which reviews Supreme Court decisions, adopted the same view, i.e., the alleged failure to exhaust administrative remedies did not apply to the request for refunds.[5] Thus, any purported failure to request refunds could not support a Commission decision to deny refunds because there was no court or NYPSC finding that IPANY had failed to request refunds.

There are three additional problems with the Commission's attempt to rely on the court statements that IPANY may have failed to exhaust administrative remedies with regard to seeking a new rate. First, these statements are incorrect. The record before the Commission directly contradicts the assertion IPANY did not ask the NYPSC to set new rates. Indeed, in the court proceedings, neither the NYPSC nor Verizon claimed IPANY failed to ask the NYPSC to set new rates. IPANY's comments to the NYPSC of September 30, 1997, stated the Verizon rates "should be rejected in favor of rates based on forward-looking economic costs",

---

[5] The specific reasoning in the trial court's decision was that IPANY had raised the Commission's *Wisconsin Orders* "in support of the position that the rates filed by Verizon in 1996 were improper" and that "This court is unaware of any petition having been filed by [the association] to modify Verizon's rates prospectively based on either the [Bureau] Wisconsin Order or the January [Commission] Wisconsin Order". JA___. The Appellate Division Decision also based its finding of failure to exhaust administrative remedies on the ground that it "note[d] the Supreme Court quite properly concluded that petitioners could have petitioned the PSC to change Verizon's rates in response to the Wisconsin Order. They did not do so and, as such, they failed to exhaust their administrative remedies." JA_____.

and went on to describe how a new, replacement rate should be set.  The comments further stated the rates "should be reduced" and that "the company [Verizon] should be instructed to re-price its input services at rates no higher than appropriate forward-looking economic costs".  JA _____.

Moreover, the 1999 IPANY Supplemental Complaint contained cost calculations for new rates and asked, among other things:

> "(c) That on a prospective basis, the rates for Public Access Lines be established at the TELRIC cost for unbundled links…", and

> (d)  That on a prospective basis, usage services be provided at rates equivalent to TELRIC costs.  JA_____.

The second problem with the Commission's attempt to rely on the non-existent failure to exhaust administrative remedies is that even if there had been such a failure, it was rendered moot by subsequent developments.   The Appellate Division also noted the filing of a separate petition in 2003 in response to which Verizon "had submitted proposed rates and supporting studies, which are currently under review by the PSC".  And, in fact, the 2003 filing was another request for new rates.  In response, the NYPSC did order new rates to be filed on June 30, 2006.  JA_____.   Thus, any issue about failing to request new rates had become moot.

Faced with incontrovertible facts in the record, the Commission acted arbitrarily and capriciously in denying the IPANY Petition on the ground it had

allegedly failed to exhaust administrative remedies with respect to refunds. But

there is a third and final reason why any such failure, even if it existed, cannot be

relied upon by the Commission. In the final analysis, the question of whether or

not the procedural niceties to support refunds at the state commissions were met is

immaterial; it was -- and is -- the Commission's obligation to order refunds to

fulfill its charge under Section 276.

> **D.      The Commission's unexplained and unsupported change in its holdings that AT&T and Verizon were not eligible for DAC in a state until actual NST-compliant rates were in effect in that state is arbitrary and capricious.**

The Commission granted requests by AT&T, Verizon, and the other BOCs

to permit them to begin receiving DAC for their payphones under Section

276(b)(1)(A) as of April 15, 1997, provided they could comply with the other

Section 276 requirements imposed on them by then.

> We must be cautious, however, to ensure that [BOCs] comply with the requirements we set forth in the *Report and Order*. Accordingly, we conclude that [BOCs] will be eligible for compensation like other PSPs when they have completed the requirements for implementing our payphone regulatory scheme to implement Section 276.

*Payphone Reconsideration Order*, ¶131.

Some of these prerequisites involved changes implementing requirements

affecting the IXCs. *Id.*, ¶131 (see prerequisite 2 regarding reductions to the IXCs'

carrier common line charge). Other prerequisites involved changes implementing

requirements affecting PSPs. *Id.* (see prerequisite 5 requiring intrastate tariffs for basic services to PSPs to be in effect). The Commission previously found the BOCs had the incentive to charge competing PSPs excessive rates for Basic Telephone Services. To counter this, and to prevent the subsidies and discrimination prohibited under Section 276(a), the Commission required the BOCs to provide Basic Telephone Services at NST-compliant rates. *Initial Payphone Order*, ¶¶146-47, 199. The Commission further held NST-compliant rates had to be in effect no later than April 15, 1997. *Payphone Reconsideration Order*, ¶¶162-63. Although the IXCs that paid the compensation had no interest in whether the BOCs provided PSPs Basic Telephone Services at NST-compliant rates, the Commission conditioned the BOCs' compensation on compliance. This was another means to enforce the NST tariffing requirements. The PSPs were direct beneficiaries of, and had a vital stake in, the Commission enforcing the rules that prevented the BOCs from collecting DAC until the BOCs complied with the NST requirement.

The Bureau repeatedly emphasized that, under the *Payphone Reconsideration Order*, for a BOC to be eligible to receive DAC in a state, it must have NST-compliant rates in effect in that state no later than April 15, 19972. *First Bureau Waiver Order*, ¶¶30, 35; *Second Bureau Waiver Order*, ¶¶10, 24-25. Although procedurally a BOC could begin receiving compensation once it self

certified that it had complied with all of the Section 276 requirements, the

Commission emphasized that the BOCs' certification did not substitute for their

obligation to actually comply with the Section 276 requirements to be eligible for

compensation.  The Commission asserted that it and the state commissions would

enforce actual compliance.  *Ameritech Illinois,* ¶27; *Bell Atlantic-Delaware,* ¶28;

*Bell Atlantic-Delaware Commission Order*, ¶1; *Global Crossing*, 259 F.3d at 744.

Despite this assurance, once the Petitioners established in the state hearings

that the BOCs' certifications were false and that their rates were not actually NST-

compliant during the many years they collected compensation, the state

commissions and the Commission failed to enforce the DAC prerequisite.  For

example, despite AT&T Illinois self-certification of compliance on April 17, 1997,

the ICC found the rates AT&T had charged to PSAPs from April 15, 1997 through

December 13, 2003 were not NST-compliant.  *ICC Order*, p. 46 Finding 20.

Throughout this time period AT&T collected hundreds of millions of dollars in

DAC for its Illinois payphones.

In 2004, the PUCO found the rates AT&T Ohio had been charging since

April 15, 1997 were also not NST compliant.  *PUCO Order,* p. 30.  This stands in

contradiction to AT&T Ohio's self certification of compliance.  *See Ameritech

Illinois*, ¶¶1, 23.  Although Verizon had self certified its compliance on June 27,

1997, on June 30, 2006 the NYPSC found that NST-compliant rates were

significantly lower than the 1997 rates. JA ___.  Despite these unrebutted facts of record, and six previous Commission orders that actual NST-compliant rates in a state were required as a prerequisite for a BOC to be eligible to receive DAC in that state, the Commission failed to enforce these requirements in the *Refund Order*.

When the Commission changes its policies it is obligated to supply a reasoned analysis for the change. *Motor Vehicle Mfrs. Ass'n,* 463 U.S. at 42, 103 S.Ct. 2856; *Global Crossing*, 259 F.3d at 746.  But in the *Refund Order* the Commission provides no explanation to justify its refusal to enforce its regulations and orders requiring AT&T and Verizon to be actually NST-compliant to be eligible to receive DAC.  The Commission offers only a footnote that the Petitioners have presented no evidence of record that the BOCs' self-certifications were defective or fraudulent or that the BOCs knew when the self-certifications were presented the rates were not NST-compliant. *Refund Order*, ¶38 fn. 161.  Yet throughout this period of the PSPs' and IXCs' complaints through state proceedings, their refusals to pay the BOCs DAC, and the Commission proceedings where the IXCs maintained that the self certifications were false, the Commission repeatedly held the rule required the BOCs to be in actual compliance regardless of beliefs expressed in their certifications.  And the Commission stated that this requirement would be enforced by the Commission and the state

commissions. *Ameritech Illinois*, ¶27; *Bell Atlantic-Delaware*, ¶28; *Global Crossing*, 259 F.3d at 744. Now that the hearings have conclusively established the BOCs did not have NST-compliant rates while collecting years of DAC, the *Refund Order* fails to enforce the Section 276 requirements. The Commission fails to present any reasonable justification for this change in policy.

Furthermore, the record is replete with contrary evidence of the BOCs failure to comply with the NST-rate requirement that the Commission simply chooses to ignore and to which it fails to respond. First, the rates have been found to be noncompliant and therefore the certification was in fact defective. Even before this the Commission had instructed AT&T that overhead loadings greater than 27% did not comply with the NST. *In the Matter of Open Network Architecture Tariffs of Bell Operating Companies,* CC Docket No. 92-91, Order, 9 F.C.C.R. 440, 477-80 Attachment C (Dec. 15, 1993) (*ONA Tariff Order*). Yet for the Illinois rates to PSPs AT&T used overheads of hundreds of percent. JA___. At the time AT&T was certifying NST compliance, the Commission was again finding AT&T using excessive overheads for NST-based rates. *In the Matter of Local Exchange Carriers' Rates, Terms and Conditions for Expanded Interconnection Through Physical Collocation for Special Access and Switched Transport*, CC Docket No. 93-162, Second Report and Order, released June 13, 1997, 12 F.C.C.R. 18730, 18857-59, ¶¶307-14 (*Physical Collocation Tariff*

*Order)*. When Congress passed Section 276, when the IPTA filed its petition at the ICC, when MCI refused to pay DAC, after multiple actions at the Commission and orders directing the NST rates, and even a second hearing by the ICC, at no time did AT&T lower its rates to the Illinois PSPs by one cent. JA___. The Commission simply ignored these and other facts impeaching AT&T's false certification without explanation. This epitomizes arbitrary and capricious decisionmaking. *Illinois Public Telecom. Assn.*, 117 F.3d at 563-64; *MCI Telecom. Corp.,* 143 F.3d at 608-09.

The *Refund Order* fails to address any of these facts of record. The Commission's decision is inconsistent with the statute and constitutes arbitrary and capricious decisionmaking. Section 276 authorizes the Commission to take whatever steps necessary to ensure fair compensation. *Id.*, 143 F.3d at 609 (also citing 47 U.S.C. §154(i)). The Commission is not bound to adhere to the existing mechanisms or procedures in other provisions of the Act. *New England Public Communications Council*, 334 F.3d at 76. The Commission should be directed to determine whether the BOCs should forfeit the illegally collected DAC where the BOCs have failed to refund rates that exceeded the NST.

**IV.  The Commission's Decision To Allow The States To Decide If Refunds Should Be Granted, And The Commission's Failure To Properly Exercise Its Supervisory Responsibility In Another Instance, Was An Unlawful Delegation To The States Of The Commission's Responsibility Under The Statute.**

Section 276 is a *federal* law imposing a *federal* regulatory scheme on interstate *and intrastate* payphone services -- *in spite of* the tradition of state regulation. Congress inserted a sweeping preemption clause to strengthen the Commission's hand.  47 U.S.C. § 276(c).  This Court explicitly recognized the broad sweep of Section 276 in displacing state regulation.  *E.g., Illinois Public Telecommunications Association, supra.*  Congress intended for the Commission to enforce the statute. Section 1 of the Act provides:

> . . . there is created a commission to be known as the "Federal Communications Commission", which . . . shall execute *and enforce* the provisions of this chapter.

47 U.S.C. § 151 (emphasis added).  As the Commission observed, "Congress enacted Section 276 to replace traditional state regulation of payphone services and create a national pro-competitive deregulatory framework".  *Payphone Reconsideration Order*, ¶139; *First Bureau Waiver Order*, ¶4; *Second Bureau Waiver Order,* ¶4.

The Commission contends nonetheless it is consistent with Section 276 for the Commission to have adopted a "dual regulatory structure" whereby the tariff review was conducted by the states and the Commission limited its "oversight to

ensur[ing] that payphone line rates [adopted by the states] are NST-compliant" but allowing the states to determine the remedy in the event the rates were noncompliant. *Refund Order*, ¶42. JA___. But the Commission could not (1) delegate authority to deprive PSPs of a federal *remedy* for noncompliance with federal law, and (2) allow the states to set their own rules as to what constitutes an NST compliant rate. As explained above, it is the Commission's duty to enforce the statute, both by prescribing rules for establishing the NST rates it mandated, and by specifying a remedy for violation of the Commission's rules. The Commission's failure to correct state commissions' and courts' misinterpretations and misapplications of clear federal law is a failure by the Commission to carry out its responsibilities under Section 276 of the Act.

**A.      The Commission delegation to the states of the authority to determine the remedy for collection by the BOCs of charges that were not NST-compliant was unlawful.**

Section 276 gave the Commission sole authority and responsibility to issue regulations carrying out its provisions. Those regulations required – as needed to comply with Section 276(a)(2) – that the BOCs comply with the NST no later than the effective date of the Commission's Section 276(b) regulations – *i.e.*, April 15, 1997.

As this Court has made clear, the Commission's authority to rely on state public service commissions to handle the Commission's statutory responsibilities

is extremely limited. Simply put, the Commission "may not subdelegate [decision-making authority] absent affirmative evidence of authority to do so." *United States Telecom Ass'n v. FCC,* 359 F.3d 554, 566 (D.C. Cir.), *cert. denied. sub nom. Nat'l Ass'n of Regulatory Utility Comm'rs v. United States Telecom Ass'n,* 543 U.S. 925 (2004) (*USTA II*) (citations omitted). In *USTA II*, this Court held the Commission unlawfully subdelegated its congressionally assigned task of making Section 251(d)(2) competitive impairment determinations by allowing the states to "make crucial decisions regarding market definition and application of the FCC's general impairment standard to the specific circumstances of those markets, with FCC oversight neither timely nor assured." *Id.* at 567.

Like the competitive-impairment decision-making in *USTA II*, Section 276 decision-making also was lodged with the Commission alone.  As in *USTA II*, the Commission allowed states to "make crucial decisions regarding . . . application of the FCC's general [NST] standard" to the "specific circumstances" in each state. *Id.* While under the plan adopted in the *Payphone Orders* the Commission allowed state commissions a major role in reviewing whether rates were NST-compliant, it was not permissible for the Commission to allow the states a decisive role in the clearly "crucial" determination of whether, after assessing excessive payphone line charges for years in clear violation of the NST, the BOCs must refund the amounts unlawfully collected from PSPs.  Leaving such "crucial" decisions to the states

cannot survive scrutiny under *USTA II* where, as here, the Commission failed to exercise timely and effective oversight of the states' remedy decisions. *Id.*

Indeed, the Commission's duty to do so here is stronger than in the *USTA II*. In *USTA II*, this Court was reviewing Commission actions arising under Sections 251 of the Act. Section 252 of the Act, a companion provision directing how the network elements designated under Section 251 are made available in interconnection/arbitration proceedings, explicitly provides for extensive and active state participation. The Court held that was not enough to indicate any intention of Congress that the states be involved in Section 251 determinations. By contrast, Section 276 confers *plenary* authority and responsibility on the Commission for both intrastate and interstate regulation of payphone services and does not assign *any* responsibility to the states for regulating *any* aspect of the federal payphone program, The preemption provision of Section 276(c) makes it absolutely clear that state actions can't interfere with the Commission's implementation of "a national pro-competitive deregulatory framework". *Payphone Reconsideration Order*, ¶139; *First Bureau Waiver Order*, ¶4; *Second Bureau Waiver Order,* ¶4. *See also Illinois Public Telecommunications Association, supra.* Thus, the Commission's duty to "superintend" the actions of

the states and take its own actions to ensure a uniform implementation of Section

276 is *a fortiori*.[6]

In the face of the compelling statute and this Court's explanation of the

Commission's duties under such a statute, the Commission offers no reasoned

statutory analysis of its decision to leave the remedy to the states. It merely states

that "[c]onsistent with the statute, the Commission created a flexible regulatory

framework under which the states administer intrastate line rates . . ." *Refund*

*Order*, ¶42. JA___. But the Commission cites no statutory provision that

evidences "an affirmative showing of congressional authorization" of authority to

delegate. USTA II at 566 (citations omitted).

As this Court observed in *USTA II, Chevron* deference is of no avail since a

general delegation to a federal agency does not in the ordinary course confer

authority to delegate to outside entities, including state commissions. *Id.* The only

statute cited by the Commission is Section 276. That statute does not speak to the

delegation issue. Thus the Commission's explanation fails under step one of the

*Chevron* analysis since there is no plain language authorizing the Commission to

delegate its authority. Nor does the Commission cite any language of Section 276

---

[6] *See USTA II*, at 567 (*quoting Tabor v. Joint Board for Enrollment of Actuaries*, 566 F.2d 705, 708 n. 5 (D.C. Cir.1977), where a federal board charged with certifying actuaries to administer ERISA pension plans was permitted to require applicants "*either* to pass a Board exam *or* to pass an exam administered by one of the recognized private national actuarial societies" (emphasis in original) and "the process was 'superintended by the [agency] in every respect'" so that "no subdelegation of decision-making authority had actually taken place."

that creates ambiguity as to authority to delegate to the states, so the Commission's assertion of authority fails under step two of *Chevron* . Thus, there is no authority for delegating to states  power to determine whether refunds were required when it is the Commission's responsibility to do so.  The Commission erred in deferring the form of remedy (or no remedy) to the states.

Congress expected and required that the Commission would implement the federal scheme in a uniform manner in a uniform federal scheme.  Under Section 276(c) the Commission's regulations shall preempt "any State requirements [to the extent they] are inconsistent with the Commission's regulations." *Id.* § 276(c).  To the extent that state commissions and/or courts denied refunds based on state law, the state rulings are "inconsistent with the Commission's regulations" requiring timely compliance with the NST. In *USTA II*, this Court expressed concern that delegation could lead to "policy drift" as the delegatees will not share the "national vision and perspective" of the statutory scheme. *Id.* at 565-66 (citations omitted). This clearly happened here; the states did not share the Commission's mandate to enforce the nondiscrimination provision of Section 276.

**B.**     **The Commission correctly recognized its duty to "superintend" state activity in applying the NST methodology yet did not correct the New York Court's bar on applying the Commission's NST methodology.**

In contrast to its approach of failing to enforce the Section 276 remedy for overcharging, the Commission recognized it alone had responsibility for

66

implementing the related aspects of the Section 276 nondiscrimination requirement uniformly, and that it could not delegate authority to the states to set their own rules. The Commission issued rulings ensuring uniformity in determining what constitutes a NST-compliant rate. But having recognized the need for uniformity, and requiring it in prior instances, the Commission inexplicably failed to do the same in New York.

The Commission itself carefully "superintended" state review of the tariffs. In contrast to its failure to supervise the states' actions remedying violations, the Commission provided repeated supervision and guidance to the states in making determinations as to whether the rates were NST-compliant. It did not fail to order states to comply with the Commission's NST standards . As discussed, the *Wisconsin Orders* provided detailed guidelines to the states for applying the NST. In separate orders, it remanded proceedings to the North Carolina and Michigan Commissions for further consideration in light of the NST guidelines the Commission had promulgated. *North Carolina Payphone Association Petition for Declaratory Ruling, supra; Michigan Payphone Association Petition for Declaratory Ruling, supra.*

Indeed in the *Refund Order* under review, the Commission again remanded an order of the Michigan Commission because the latter had not properly applied the NST in determining the appropriate overhead allocator for payphone usage.

*Refund Order,* ¶¶ 50-55.  The Commission engaged in a sophisticated, detailed analysis of the Michigan Commission's order and remanded it to the Michigan Commission for further proceedings in light of the FCC's corrective guidance.[7]

The Commission's reliance on the states to conduct the initial NST review is justifiable under *Tabor* and *USTA II* because the Commission follows its obligation to "superintend [the NST review process] in every respect," as in each of the instances cited above. Yet the Commission has not consistently exercised its responsibilities.

Thus, in New York, the state courts have precluded the NYPSC, when it conducts the remand directed by those courts, from applying either of the *Wisconsin Orders* in determining whether Verizon's rates were NST compliant. *See New England Public Communications Council.*  The Commission has specifically allowed the NYPSC to apply the NYPSC's own ratemaking principles – principles inconsistent with the methodology required by the Commission in other states – to determine NST compliance.  Failure by the Commission to preempt that unlawful result is an abdication of the Commission's obligation to oversee implementation of the Section 276 mandate. The Court should direct the Commission to preempt the state court determinations and require the NYPSC to

---

[7] The Commission relies on the *Wisconsin Reconsideration Order* in denying relief to Petitioners. *Refund Order*, ¶44.  But that order merely affirmed the Commission's decision allowing Wisconsin to conduct the initial NST review.  It did not accord deference to a state rate methodology or to a state's determination of whether to enforce a federal statute.

apply the *Wisconsin Orders* in determining the rate to be used as the basis for calculating refunds for the period prior to July 30, 2006.

## CONCLUSION

The Court should vacate the Commission's *Refund Order* to the extent that it denies refunds to the members of the Illinois Public Telecommunications Association, the Independent Payphone Association of New York and the Payphone Association of Ohio. The matter should be remanded back to Commission for an order consistent with the Court's opinion that charges by AT&T and Verizon made to Petitioners' members after April 15, 1997 that exceeded NST-compliant rates must be refunded with interest. Overcharges that exceeded the NST-compliant rates established in the Illinois Commerce Commission and Public Utilities Commission of Ohio proceedings should be issued immediately. The Commission should issue an order to the New York Public Service Commission:

1.  To conduct a remand proceeding to determine if Verizon's pre-existing rates for PSP lines, usage, and features complied with the NST as of April 15, 1997.

2.  During such remand proceeding, in determining whether the pre-existing rates were NST-compliant as of April 15, 1997, the NYPSC shall follow and apply the terms of all the Commission's payphone orders, including the *Wisconsin Bureau Order* and the *Wisconsin Payphone Order*.

3.  If the NYPSC finds, after the remand proceeding, that the pre-existing rates were not NST-compliant as of April 15, 1997, the NYPSC shall

order Verizon to issue refunds to PSP's of the difference between (a) the rates for lines, usage, and features in effect on April 15, 1997, and (b) the NST-compliant rates established by the NYPSC for PAL lines, usage, and features by Order dated June 30, 2006, and contained in Verizon's Compliance filing of July 31, 2006, together with interest back to April 15, 1997.

4.    The relief granted following the remand proceeding should also be applied to the complainants in the Second IPP Complaint filed March 17, 2003.

The Court should further vacate and remand to the Commission that part of the order failing to enforce the Commission's requirement that the BOCs must have actual NST-rates in effect to be eligible to receive dial around compensation, with directions to the Commission to decide whether the BOCs' violations of this requirement should result in forfeiture of the DAC collected before the BOCs were eligible in light of this Court's decision.

Dated:  August 30, 2013                Respectfully submitted,

                                By:  /s/ Michael W. Ward
                                     Michael W. Ward
                                     John F. Ward, Jr.
                                     WARD & WARD, P.C.
                                     One Rotary Center
                                     1560 Sherman Ave., Suite 805
                                     Evanston, IL 60201
                                     (224) 420-9766
                                     (847) 869-8287 (facsimile)
                                     mwward@dnsys.com
                                     jward@levelerllc.com

                                     Barbara A. Miller
                                     KELLEY DRYE & WARREN LLP
                                     3050 K Street, N.W., Suite 400

Washington, D.C. 20007
(202) 342-8400
(202) 342-8451(fax)
bmiller@kelleydrye.com
*ATTORNEYS FOR ILLINOIS PUBLIC
TELECOMMUNICATIONS
ASSOCIATION*


Keith J. Roland
HERZOG LAW FIRM P.C.
7 Southwoods Boulevard
Albany, New York 12211
(518) 465-7581
kroland@herzoglaw.com
*ATTORNEYS FOR INDEPENDENT PAYPHONE
ASSOCIATION OF NEW YORK*

Donald J. Evans
Paul F. Feldman
FLETCHER, HEALD & HILDRETH, P.L.C.
1300 North 17th Street
Eleventh Floor
Arlington, Virginia 22209
(703) 812-0400
evans@fhhlaw.com
*ATTORNEYS FOR PAYPHONE ASSOCIATION
OF OHIO, INC.*

Of Counsel: Albert H. Kramer
ALBERT H. KRAMER, PLLC
1825 I Street, N.W.
Suite 600
Washington, D.C. 20006
(202) 207-3649
akramer@apcc.net

## CERTIFICATE OF COMPLIANCE WITH RULE 32(a)

This brief complies with the type-volume limitation of Fed.R.App.P. 32(a)(7)(B), as amended per the Court order entered July 9, 2013 to not exceed 16,250 words for the Joint Petitioner Brief, because it contains 16,201 words excluding the part of the brief exempted by Fed.R.App.P.32(a)(7)(B)(iii).  This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because it has been prepared in a proportionally spaced typeface using Microsoft Word 2010 in 14-point Times New Roman.

/s/ Barbara A. Miller
Barbara A. Miller
*ATTORNEY FOR ILLINOIS PUBLIC*
*TELECOMMUNICATIONS ASSOCIATION*

August 30, 2013

# ADDENDUM

**Relevant Statutes**

**47 U.S.C. § 251.  Interconnection**

**(d)   Implementation**

**(1)   In general**

Within 6 months after February 8, 1996, the Commission shall complete all actions necessary to establish regulations to implement the requirements of this section.

**(2)   Access standards**

In determining what network elements should be made available for purposes of subsection (c)(3) of this section, the Commission shall consider, at a minimum, whether—

(A) access to such network elements as are proprietary in nature is necessary; and

(B) the failure to provide access to such network elements would impair the ability of the telecommunications carrier seeking access to provide the services that it seeks to offer.

**(3)   Preservation of State access regulations**

In prescribing and enforcing regulations to implement the requirements of this section, the Commission shall not preclude the enforcement of any regulation, order, or policy of a State commission that—

(A) establishes access and interconnection obligations of local exchange carriers;

(B) is consistent with the requirements of this section; and

(C) does not substantially prevent implementation of the requirements of this section and the purposes of this part.

## 47 U.S.C. § 276. Provision of payphone service

**(a)    Nondiscrimination safeguards**

After the effective date of the rules prescribed pursuant to subsection (b) of this section, any Bell operating company that provides payphone service—

(1) shall not subsidize its payphone service directly or indirectly from its telephone exchange service operations or its exchange access operations; and

(2) shall not prefer or discriminate in favor of its payphone service.

**(b)    Regulations**

**(1)    Contents of regulations**

In order to promote competition among payphone service providers and promote the widespread deployment of payphone services to the benefit of the general public, within 9 months after February 8, 1996, the Commission shall take all actions necessary (including any reconsideration) to prescribe regulations that—

(A) establish a per call compensation plan to ensure that all payphone service providers are fairly compensated for each and every completed intrastate and interstate call using their payphone, except that emergency calls and telecommunications relay service calls for hearing disabled individuals shall not be subject to such compensation;

(B) discontinue the intrastate and interstate carrier access charge payphone service elements and payments in effect on February 8, 1996, and all intrastate and interstate payphone subsidies from basic exchange and exchange access revenues, in favor of a compensation plan as specified in subparagraph (A);

(C) prescribe a set of nonstructural safeguards for Bell operating company payphone service to implement the provisions of paragraphs (1) and (2) of subsection (a) of this section, which safeguards shall, at a minimum, include the nonstructural safeguards equal to those adopted in the Computer Inquiry-III (CC Docket No. 90–623) proceeding;

(D) provide for Bell operating company payphone service providers to have the same right that independent payphone providers have to negotiate with the location provider on the location provider's selecting and contracting with, and, subject to the terms of any agreement with the location provider, to select and contract with, the carriers that carry interLATA calls from their payphones, unless the Commission determines in the rulemaking pursuant to this section that it is not in the public interest; and

(E) provide for all payphone service providers to have the right to negotiate with the location provider on the location provider's selecting and contracting with, and, subject to the terms of any agreement with the location provider, to select and contract with, the carriers that carry intraLATA calls from their payphones.

**(2)     Public interest telephones**

In the rulemaking conducted pursuant to paragraph (1), the Commission shall determine whether public interest payphones, which are provided in the interest of public health, safety, and welfare, in locations where there would otherwise not be a payphone, should be maintained, and if so, ensure that such public interest payphones are supported fairly and equitably.

**(3)     Existing contracts**

Nothing in this section shall affect any existing contracts between location providers and payphone service providers or interLATA or intraLATA carriers that are in force and effect as of February 8, 1996.

**(c)     State preemption**

To the extent that any State requirements are inconsistent with the Commission's regulations, the Commission's regulations on such matters shall preempt such State requirements.

**(d)     "Payphone service" defined**

As used in this section, the term "payphone service" means the provision of public or semi-public pay telephones, the provision of inmate telephone service in correctional institutions, and any ancillary services.

## Relevant Regulations

**47 C.F.R. § 61.49 - Supporting information to be submitted with letters of transmittal for tariffs of carriers subject to price cap regulation.**

(a)     Each price cap tariff filing must be accompanied by supporting materials sufficient to calculate required adjustments to each PCI, API, and SBI pursuant to the methodologies provided in §§ 61.45, 61.46, and 61.47, as applicable.

(b)     Each price cap tariff filing that proposes rates that are within applicable bands established pursuant to § 61.47, and that results in an API value that is equal to or less than the applicable PCI value, must be accompanied by supporting materials sufficient to establish compliance with the applicable bands, and to calculate the necessary adjustment to the affected APIs and SBIs pursuant to §§ 61.46 and 61.47, respectively.

(c)     Each price cap tariff filing that proposes rates above the applicable band limits established in        §§ 61.47 (e) must be accompanied by supporting materials establishing substantial cause for the proposed rates.

(d)     Each price cap tariff filing that proposes rates that will result in an API value that exceeds the applicable PCI value must be accompanied by:

(1)     An explanation of the manner in which all costs have been allocated among baskets; and

(2)     Within the affected basket, a cost assignment slowing down to the lowest possible level of disaggregation, including a detailed explanation of the reasons for the prices of all rate elements to which costs are not assigned.

(e)     Each price cap tariff filing that proposes restructuring of existing rates must be accompanied by supporting materials sufficient to make the adjustments to each affected API and SBI required by §§ 61.46(c) and 61.47(d), respectively.

(f)     (1)     [Reserved]

(2)     Each tariff filing submitted by a price cap LEC that introduces a new loop-based service, as defined in § 61.3(pp) of this part—including a restructured unbundled basic service element (BSE), as defined in § 69.2(mm) of this chapter, that constitutes a new loop-based service—that is

or will later be included in a basket, must be accompanied by cost data sufficient to establish that the new loop-based service or unbundled BSE will not recover more than a just and reasonable portion of the carrier's overhead costs.

(3)     A price cap LEC may submit without cost data any tariff filings that introduce new services, other than loop-based services.

(4)     A price cap LEC that has removed its corridor or interstate intraLATA toll services from its interexchange basket pursuant to § 61.42(d)(4)(ii), may submit its tariff filings for corridor or interstate intraLATA toll services without cost data.

(g)     Each tariff filing submitted by a local exchange carrier subject to price cap regulation that introduces a new loop-based service or a restructured unbundled basic service element (BSE), as defined in § 69.2(mm) of this chapter, that is or will later be included in a basket, or that introduces or changes the rates for connection charge subelements for expanded interconnection, as defined in § 69.121 of this chapter, must also be accompanied by:

(1)     The following, including complete explanations of the bases for the estimates.

(i)     A study containing a projection of costs for a representative 12 month period; and

(ii)     Estimates of the effect of the new tariff on the traffic and revenues from the service to which the new tariff applies, the carrier's other service classifications, and the carrier's overall traffic and revenues. These estimates must include the projected effects on the traffic and revenues for the same representative 12 month period used in paragraph (g)(1)(i) of this section.

(2)     *Working papers and statistical data.* (i) Concurrently with the filing of any tariff change or tariff filing for a service not previously offered, the Chief, Tariff and Pricing Analysis Branch must be provided two sets of working papers containing the information underlying the data supplied in response to paragraph (h)(1) of this section, and a clear explanation of how the working papers relate to that information.

(ii)     All statistical studies must be submitted and supported in the form prescribed in § 1.363 of the Commission's rules.

(h)     Each tariff filing submitted by a local exchange carrier subject to price cap regulation that introduces or changes the rates for connection charge subelements for expanded interconnection, as defined in § 69.121 of this chapter, must be accompanied by cost data sufficient to establish that such charges will not recover more than a just and reasonable portion of the carrier's overhead costs.

(i)     [Reserved]

(j)     For a tariff that introduces a system of density pricing zones, as described in § 69.123 of this chapter, the carrier must, before filing its tariff, submit a density pricing zone plan including, *inter alia,* documentation sufficient to establish that the system of zones reasonably reflects cost-related characteristics, such as the density of total interstate traffic in central offices located in the respective zones, and receive approval of its proposed plan.

(k)     In accordance with §§ 61.41 through 61.49, local exchange carriers subject to price cap regulation that elect to file their annual access tariff pursuant to section 204(a)(3) of the Communications Act shall submit supporting material for their interstate annual access tariffs, absent rate information, 90 days prior to July 1 of each year.

(l)     On each page of cost support material submitted pursuant to this section, the carrier shall indicate the transmittal number under which that page was submitted.

**47 C.F.R. § 64.1330.  State review of payphone entry and exit regulations and public interest payphones.**

      (c)    Each state must review its rules and policies to determine whether it has provided for public interest payphones consistent with applicable Commission guidelines, evaluate whether it needs to take measures to ensure that such payphones will continue to exist in light of the Commission's implementation of Section 276 of the Communications Act, and administer and fund such programs so that such payphones are supported fairly and equitably.